Bruce COLLYER, Plaintiff–Appellant,

v.

Gregory DARLING, et al., Defendants–Appellees.

Nos. 94–3442, 94–3443.

United States Court of Appeals,
Sixth Circuit.

Decided Sept. 30, 1996.

Thomas E. O'Toole (argued and briefed), Cleveland, OH, for plaintiff-appellant.

Joseph N. Rosenthal (briefed), Beth C. Shillington (briefed), Jack W. Decker (argued and briefed), Office of Attorney General, Columbus, OH, for Gregory D. Darling, Arthur T. Laney, Jr., William Flaherty, Robert Cobbs, F.A. Lingl, M.D., Ronald I. Ostroff, William B. Edwards, Robert W. Foster, Dorothy Sivis, Tamala A. Solomon, Shirley Grumbling, Charles H. Vann, James G. Nibert, John A. Beattie, Merle Walker, Jerome C. Manuel, Paul D. Guthrie, Jerry Johnson, Patrick J. Rafter, Steve Gulyassy, Magdi S. Rizk, Jocelyn Schweitzer, Stephen A. Perry, Lee Fisher, Attorney General.

Barbara Ann Serve (argued and briefed), Office of Attorney General, Labor Relations Section, Columbus, OH, for Patricia A. Hamilton, J. Richard Lumpe, William E. Hinig.

Before: KEITH, KENNEDY, and SILER, Circuit Judges.

KEITH, Circuit Judge.

Plaintiff-appellant, Bruce Collyer appeals the district court's order granting summary judgment in favor of the defendants-appellees on his claims of civil rights violations under 42 U.S.C. §§ 1983 and 1985(3) and Ohio State Law. For the reasons set forth below, we AFFIRM the district court's ruling.

I.

In May, 1982, Bruce Collyer was hired by the Broadview Developmental Clinic ("BDC"), an institution operated by the Ohio Department of Mental Retardation and Developmental Disabilities, as a Therapeutic Program Worker ("TPW"), a position in the classified civil service. As a TPW, Collyer was responsible for implementing programs designed to improve the skills of severely retarded adults. In 1982, Collyer became active on BDC's Human Rights Committee, a group established to deal with patient's rights issues. He also became a representative to the Ohio Civil Service Employees Association, Local 11 ("Union"), on the BDC's Health and Safety Committee, chaired by defendant-appellee Arthur T. Laney. During his tenure on those committees, Collyer raised certain concerns involving employee rights and client safety. Collyer claims that unnamed persons told him to cease voicing complaints since such discussions could cause liability and medicaid certification problems for the BDC.

In 1984 Collyer was promoted, but after receiving his third suspension, he was returned to the TPW position. Collyer claims that during this period, two persons not named as defendants harassed him into keeping quiet about patients' concerns and warned that if he did not, he would sacrifice his ability to achieve a promotion to management.

In 1985, Collyer claims that he was subjected to further harassment after the media criticized the BDC for suspected client abuse. At that time Collyer received a fourth suspension for failing to report client abuse. In response, he filed hundreds of reports of possible abuse and reported abuse over a hotline set up by the Ohio Department of Mental Retardation. In 1986, defendant-appellee BDC Chief of Security Charles H. Vann questioned Collyer about his reports and issued his own report concluding that Collyer's claims were unsubstantiated.

Collyer was fired from his TPW position in August 1986. His termination was vacated and he was reinstated in May 1987. However, because Collyer had sudden outbursts of anger some thought to be dangerous to BDC

clients, he was reassigned to the position of a doorman. In April 1988, one month after becoming the new Superintendent of the BDC, concerned about the reasons underlying Collyer's placement as a doorman, Gregory D. Darling requested approval from the Ohio Department of Administrative Services to order a psychiatric examination of Collyer.

Before the psychiatric examination was conducted, Collyer had an altercation with BDC Chief of Security Robert Cobbs. Collyer claimed he was in fear of his life because of Cobbs and requested temporary leave. After investigation, Darling determined that Collyer had demonstrated some of the same disturbing behavior noted earlier and that he was not, as he asserted, in danger of losing his life at the hands of Cobbs.

Darling informed Collyer and Collyer's counsel that a psychiatric evaluation would be necessary because of Collyer's behavior at work. Pending this evaluation, Collyer was to remain on administrative leave with pay. The examiner, Dr. Friedrich A. Lingl, an independent psychiatrist with whom the State of Ohio had contracted to conduct this particular examination, concluded that Collyer suffered from a paranoid personality disorder that prevented him from functioning effectively as a TPW.

Darling sent a letter to Collyer's counsel on August 4, 1988, stating that due to Dr. Lingl's report, Collyer would have to be separated from employment in some fashion yet to be determined. Collyer was also instructed to indicate the kind of leave on which he wished to be placed. The BDC then issued a notice of personal conference warning that failure to comply with the August 4 letter might result in disciplinary action. The conference occurred on August 15 and was attended by Collyer, his counsel and a Union representative. As a result of the conference, Collyer's status was changed to "unpaid leave of absence." The BDC retroactively applied Collyer's separation to August 4, 1988.

On October 24, 1988, Collyer filed a complaint in the Northern District of Ohio seeking relief under 42 U.S.C. §§ 1983 and 1985(3) against Darling, Cobbs, Laney, Dr. Lingl, and former director of the Ohio Department of Administrative Services, William Flaherty. Collyer also claimed that the named defendants had deprived him of due process in retaliation for the exercise of his First Amendment rights.

While the 1988 federal case was pending, Collyer applied for and was denied disability benefits by the Ohio Department of Administrative Services. Collyer appealed the decision. On appeal, an Ohio Department of Administrative Services hearing officer determined that Dr. Lingl's report alone was not enough to support Collyer's claims for disability benefits. Collyer appealed to the Franklin County Court of Common Pleas which eventually dismissed his case for lack of prosecution.

When defendant-appellee Ronald I. Ostroff replaced Darling as Superintendent of the BDC in 1989, he ordered Collyer to submit to a second psychiatric examination. This time Dr. Rizk, also an independent psychiatrist with whom the state had contracted, concluded that Collyer suffered from a paranoid personality disorder and was unfit to function as a TPW. Dr. Rizk recommended further testing. Following Dr. Rizk's evaluation, Ostroff conducted a meeting with Collyer and his present counsel prior to a planned imposition of an involuntary separation based upon Dr. Rizk's findings. On February 21, 1990, Ostroff ordered Collyer disability separated.

Collyer appealed his 1990 disability separation to the Ohio State Personnel Board of Review ("SPBR"). On August 7, 1990, the SPBR determined that Collyer should be reinstated with back pay and benefits from August 8, 1988, due to a procedural error committed by the BDC.[1] The BDC appealed to the Franklin Court of Common Pleas which ultimately determined that the BDC had no right to appeal and that the SPBR's

---

1. The BDC erred by failing to file a copy of the Ohio Revised Code § 124.34 separation order

ruling should remain.[2]

Pursuant to the SPBR's ruling, in October, 1991, the BDC reinstated Collyer effective February 28, 1990. However, in direct contravention of the SPBR ruling, the BDC did not give Collyer back pay and benefits for the period beginning August 4, 1988 to the 1990 SPBR appeal. Collyer did not seek enforcement of the ruling under Ohio state law.[3]

In May, 1992, the district court ruled on the parties' cross motions for summary judgment in Collyer's 1988 case, granting partial summary judgment in Collyer's favor on the claim that he was entitled to and not afforded a predeprivation hearing, rejecting Collyer's claim that such a hearing was required before a psychiatric exam, and denying defendants' motion to dismiss Collyer's First Amendment claim. Collyer's state law claims were dismissed for lack of jurisdiction.

On July 27, 1992, Collyer amended his 1988 Complaint and on August 3, 1992, Collyer filed a complaint identical to the amended complaint in a new action. The new pleadings added new defendants and several new §§ 1983 and 1985 claims stating that: (1) SPBR Chairperson Hamilton and Members Lumpe and Hinig (collectively, "SPBR Members") denied Collyer a meaningful postdeprivation hearing in 1990; (2) the SPBR Members failed to provide Collyer a "name-clearing" hearing in 1990; (3) defendants' refusal to pay all of the back pay and benefits ordered by the SPBR Members violated due process; (4) defendant-appellee Lee Fisher, Attorney General of Ohio, was obligated to enforce the civil service laws and

order of the SPBR Members; and (5) some or all of the old and new employees conspired to violate Collyer's First Amendment rights by making false charges and physical threats, assigning him to demeaning jobs, terminating his employment, and barring him from attending meetings of advocacy groups on BDC grounds. Collyer also named Dr. Rizk as a defendant, alleging that the doctor had violated his due process rights.[4]

Shortly after Collyer filed his new complaint, the SPBR Members moved to dismiss the complaint on the basis of quasi-judicial immunity. Dr. Rizk moved for summary judgment claiming that as a psychiatrist, he was entitled to state-law qualified privilege. He also asserted that as a private physician, he could not be held liable under § 1983. Many of the newly added defendants moved for summary judgment on the grounds that the statute of limitations had run. The remaining defendants moved for summary judgment and requested reconsideration of the prior adverse rulings in the 1988 case.

On March 18, 1994, the district court issued a ruling from the bench, vacating its decision in the 1988 case, granting the SPBR Members' motion to dismiss, granting the remaining state defendants' motion for partial summary judgment, granting Dr. Rizk's motion for summary judgment, denying Collyer's "counter-motion" for summary judgment, and dismissing all of Collyer's remaining claims in both his 1988 and 1992 cases. Collyer timely filed this appeal.[5]

## II.

In the court below, Collyer claimed, against a total of twenty-seven defendants,

with the SPBR.

2. On June 23, 1993, the Court of Common Pleas also awarded Collyer $ 10,293.75 for attorney fees incurred in his defense of the BDC's appeal.

3. Immediately after reinstating Collyer, the BDC placed him on administrative leave with pay pending a new psychiatric evaluation. In February of 1992, after Dr. Rizk determined that Collyer was still suffering from paranoia and unfit for work, the BDC once again disability separated Collyer. Collyer grieved his separation and appealed to the SPBR. Further, in 1993, the Ohio General Assembly amended the rules governing SPBR jurisdiction and made clear that the SPBR has jurisdiction over all involuntary

disability separations. Accordingly, the procedural aspects of Collyer's 1992 separation were litigated before the SPBR in June of 1993, and the BDC's decision was ultimately affirmed. Finally, in 1993 the BDC closed. Collyer, on the theory that he had the right to be employed at a neighboring facility, grieved his disability separation once more. This grievance awaits arbitration.

4. The district judge was not sure, and nor are we certain whether Collyer was also asserting a state law claim of defamation against Dr. Rizk. The lower court thus rendered alternative rulings.

5. This Court consolidated Collyer's cases for the purposes of appeal.

violations of procedural due process under 42 U.S.C. §§ 1983 and 1985(3) and violations of the First Amendment. The lower court rendered its ruling from the bench on the various motions to dismiss and on summary judgment as submitted by the parties. A careful review of the issues raised on appeal reveals that the central issue we must decide is whether Collyer is precluded from bringing his procedural due process claims to federal court because of adequate state remedies. However, because Collyer filed suit seeking monetary damages, declaratory and injunctive relief against a variety of defendants, some in their individual capacities and others in both their individual and official capacities, and since nearly all defendants-appellees raised the defenses of absolute or qualified immunity as well, the lower court ruled on all claims and defenses. Given the complicated nature of this case, we address the issues in the order outlined below.

In Part A we find that the district court properly dismissed eleven of the twenty-seven defendants-appellees on the grounds that Collyer's claims were precluded by the statute of limitations.

In part B we turn to Collyer's procedural due process claims against the remaining defendants-appellees, excluding Dr. Lingl and Dr. Rizk. In section 1 of part B, we find that the lower court: (1) properly dismissed all claims for money damages against the SPBR Members on the grounds of absolute immunity; and (2) properly dismissed all claims for injunctive and declaratory relief against the SPBR Members for failure to state a claim upon which relief could be granted. In Section 2 we conclude that the lower court improperly dismissed all claims for money damages against Ohio Attorney General Lee Fisher on the grounds of absolute immunity, but properly dismissed all claims for monetary damages, injunctive and declaratory relief against Fisher for failure to state a claim upon which relief could be granted. In Section 3 we hold that the district court properly granted summary judgment on all claims for monetary damages, injunctive and declaratory relief against de-

fendants-appellees Darling, Laney, Flaherty, Cobbs, Manuel, Perry, Ostroff, Schweitzer, and Gulyassy ("State Defendants") for failure to state a claim of procedural due process violations.

In part C we address Collyer's First Amendment claims. Within this part we conclude that the lower court correctly dismissed all claims for monetary damages against the SPBR Members on absolute immunity grounds, and improperly granted Attorney General Fisher absolute immunity. We also find that Collyer failed to state a claim for injunctive or declaratory relief against the SPBR Members and Attorney Fisher. Finally, we conclude the lower court correctly granted summary judgment in favor of the State Defendants since there was not any evidence that any of the defendants violated Collyer's First Amendment rights.

## A. Statute Of Limitations

■ With the exception of one of the newly added claims arising out of an incident that took place in 1991, in their motion for summary judgment, defendants-appellees Beattie, Edwards, Foster, Grumbling, Guthrie, Johnson, Nibert, Ostroff, Rafter, Schweitzer, Sivic, Solomon, Vann, and Walker argued that Collyer was precluded from adding them as defendants in both his amended 1988 complaint and his new 1992 action by the statute of limitations.[6] The district court granted these defendants' motion for summary judgment on the ground that Collyer failed to file his claims within the two year statute of limitations. The district court also noted that it was "impossible ... to ascertain exactly what actions [the defendants] individually took within the complaint that would make them subject to the various remedies requested."

■ This Court reviews de novo a district court's application of the law. *Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1328 (6th Cir. 1992). Motions for summary judgment must be viewed in the light most favorable to the nonmoving party and there must be no dispute over genuine issues of material fact.

---

**6.** Collyer alleged in his new complaint that Appellees Ostroff and Schweitzer refused to rein-

state him in October 1991, a point in time well within the applicable statute of limitations.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

 In § 1983 actions, we apply the relevant state statute of limitations to determine whether the claim is timely filed. 42 U.S.C. § 1983 (1988); *Wilson v. Garcia,* 471 U.S. 261, 268–69, 105 S.Ct. 1938, 1942–43, 85 L.Ed.2d 254 (1985). For civil rights claims brought in Ohio, the two year general statute of limitations contained in Ohio Revised Code § 2305.10 applies. *Browning v. Pendleton,* 869 F.2d 989, 992 (6th Cir.1989). However, federal law determines the accrual of civil rights claims. *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir.1984). Under federal law as developed in this Circuit, the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred. *Friedman v. Estate of Presser,* 929 F.2d 1151, 1159 (6th Cir.1991).

 Additionally, under Federal Rule of Civil Procedure 15(c), amendments to a complaint will relate back to the original pleading so long as the newly added party had sufficient notice of the action.[7] However, such amendments will not survive preclusive application of the statute of limitations unless the amendments are corrections of misnomers. Fed.R.Civ.P. 15(c); *see, e.g., In re Kent Holland Die Casting & Plating, Inc.,* 928 F.2d

1448, 1450 (6th Cir.1991); *Ringrose v. Engelberg Huller Co., Inc.,* 692 F.2d 403, 405 (6th Cir.1982).

Collyer amended his complaint to add the above-named defendants on July 27, 1992, nearly four years after he filed the original complaint (October 24, 1988). All of the acts Collyer attributes to each of the defendants in the new complaint, with the exception of the October 1991 refusal to reinstate, occurred before July 27, 1990. However, although in very cursory fashion, Collyer does provide several arguments for tolling the statute.

 First, Collyer argues that the statute of limitations should run from the point at which he received " 'unequivocal' notice that the [SPBR] decision [was] final and [would] be followed by no further process." Yet, defendants counter and we agree that Collyer had sufficient notice of the review he would be accorded by the SPBR pursuant to former Ohio Administrative Code Rule 124–7–04, which is the process he in fact received. Second, Collyer contends that an ongoing conspiracy to violate his civil rights should toll the statute of limitations. However, as discussed *infra,* Collyer only provides conclusory allegations insufficient to support a claim of conspiracy. Third, Collyer claims that the statute is tolled pending the completion of his administrative remedies. However, Collyer failed to pursue any further administrative remedies within the time frame that would permit him to add the above-named appellees.[8] Finally, Collyer argues that the statute of limitations should be tolled because the defendants fraudulently represented that they were willing to provide him

---

**7.** Federal Rule of Civil Procedure 15(c) provides in relevant part:

> An amendment of a pleading relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and

> complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

**8.** The SPBR decision was rendered February 1, 1990. The SPBR disaffirmed the BDC decision on August 7, 1990. Although the BDC appealed the SPBR order and Collyer received attorney's fees for the BDC appeal, Collyer did not pursue any remedies after February 1, 1990.

a postdeprivation hearing on the merits before the SPBR. However, we cannot find fraud in the face of a record and Ohio law that taken together make clear that such a decision was clearly beyond the control of the defendants. Collyer's fraud claim is further suspect given the fact that he was represented by counsel throughout, and thus, could not have reasonably relied upon such a promise.

For the above reasons, the district court's decision to grant summary judgment in favor of the above-named defendants-appellees is affirmed.

### B. Procedural Due Process

We next address Collyer's procedural due process claims against the SPBR Members, Attorney General Fisher, and the State Defendants.[9] Collyer sought prospective relief and reinstatement on the grounds that the above-named defendants violated his procedural due process rights. Specifically, Collyer alleged that: (1) he was denied a predeprivation hearing prior to being placed on administrative leave; (2) he was entitled to and denied a predeprivation hearing prior to having to submit to a psychiatric evaluation; and (3) he was denied the opportunity to invoke his postdeprivation remedies because the state appellees mislabeled his type of discharge.

We will first address the lower court's ruling on the issue of absolute immunity. We will then address Collyer's procedural due process claims, concluding that Collyer had adequate state remedies, thus precluding him from bringing this procedural due process claim in federal court. Since we conclude Collyer failed to state a claim of deprivation of procedural due process we do not need to address the defendant's qualified immunity defense.

### 1. SPBR

Collyer sued the SPBR Members, individually and in their official capacities for denying him a merit hearing in conjunction with his administrative appeal. The district court held that the SPBR Members were absolutely immune from suit for money damages in their individual capacities because they performed an adjudicatory function within an administrative agency. We agree.

As indicated earlier, this court reviews *de novo* a district court's application of the law. *Hurt,* 956 F.2d at 1328. When considering a motion to dismiss, the factual allegations of the complaint must be taken as true. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). The standard for dismissals under Rule 12(b)(6) is quite liberal. *Id.*

It is well established that judges performing adjudicatory functions are absolutely immune from suits for money damages. *Mireles v. Waco,* 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991)(per curiam); *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Bush v. Rauch,* 38 F.3d 842 (6th Cir.1994). As we stated in *Bush,*

> The Supreme Court has endorsed a "functional approach in determining whether an official is entitled to absolute immunity [citing *Forrester,* 484 U.S. at 224, 108 S.Ct. at 542–43; *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) ]. Under this approach, a court 'looks to' the nature of the function performed, not the identity of the actor who performed it."

*Bush,* 38 F.3d at 847 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993)). Furthermore, in extending absolute immunity to those within administrative agencies who perform functions similar to judges and prosecutors, the Supreme Court has recognized that administrative proceedings are usually adversarial in nature and provide many of the same features and safeguards that are provided in court. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).[10]

---

**9.** This list of defendants excludes both Dr. Lingl and Dr. Rizk who we conclude are not state actors subject to suit under § 1983 and may not

be held liable for conspiracy under section 1983 or section 1985(3) for the reasons stated *infra.*

**10.** The Supreme Court considered the following factors, including the adversarial nature of the

■ Under Ohio law, the purpose of the SPBR is to hear and decide disputes involving members of the classified civil service. Ohio Rev.Code Ann. § 124.03 (Baldwin 1992). The decisions of the SPBR may be appealed to the Ohio courts. Unless the provisions of a collective bargaining agreement otherwise apply, the SPBR is the only forum provided by Ohio State law that hears and decides disputes between employers and public employees. *See* Ohio Rev.Code § 4117.10(A)(Page 1994).

Collyer alleges that the SPBR Members violated his rights when they denied his request for a full merit hearing. Collyer requested the hearing after the BDC failed to fully abide by the SPBR order to reinstate him with benefits and backpay dating from August 4, 1988. It is clear from the record that the SPBR considered Collyer's claim and then dismissed it after concluding it had no jurisdiction to hear such an appeal under Ohio law. Thus, the SPBR Members acted within their adjudicatory function when they allegedly violated Collyer's rights. They are, therefore, entitled to absolute immunity from monetary damages.

■ However, since immunity only precludes claims for monetary damages against officials in their individual capacities, and not claims for injunctive or declaratory relief, this Court must address the claim on its merits. *See, e.g., Cagle v. Gilley,* 957 F.2d 1347 (6th Cir.1992). Looking to the merits of Collyer's claim, we can find no law that would allow Collyer to sue the SPBR under § 1983 for the acts alleged here. Accordingly, Collyer is not entitled to injunctive or declaratory relief against the SPBR.

### 2. Attorney General Fisher

■ Collyer also sued Ohio Attorney General Lee Fisher individually and in his official capacity for declining to prosecute appellee Ostroff in order to force Ostroff to comply with the SPBR's order directing the BDC to reinstate Collyer with full back pay and benefits dating from August 4, 1988.

The lower court ruled that Fisher was absolutely immune from suit for money damages. For the following reasons, we reverse on the issue of absolute immunity but ultimately rule in Fisher's favor.

■ It is well established that unless affirmatively pleaded, the defenses of qualified and absolute immunity are waived. *Kennedy v. City of Cleveland,* 797 F.2d 297 (6th Cir.1986). Immunity defenses may be raised in motions to dismiss, affirmative defenses or motions for summary judgment. *See Dominque v. Telb,* 831 F.2d 673 (6th Cir.1987). After carefully reviewing the record below, it does not appear that defendant-appellee Fisher ever raised the affirmative defense of absolute immunity and the district judge makes no mention of what he relies upon to render his absolute immunity decision. Although defendant-appellee Fisher did raise the affirmative defense of qualified immunity, an absolute immunity determination involves an entirely different analysis. Given that the defense of absolute immunity was not affirmatively pleaded or argued by defendant-appellee Fisher prior to the lower court's decision, and in light of the significant distinctions between qualified and absolute immunity claims, this defense was affirmatively waived and should not have been resolved by the lower court. However, looking to the merits of Collyer's claims, we can find no law that allows a § 1983 action that would force the state to prosecute. Accordingly, we conclude that Collyer has failed to state a claim under § 1983 and is thus not entitled to money damages, injunctive or declaratory relief against Attorney General Fisher.

### 3. The State Defendants

The lower court ruled that Collyer had waived his right to bring a § 1983 predeprivation denial of due process claim by agreeing to the terms of a collective bargaining agreement that provided for final and binding arbitration of such claims. The lower court further ruled that Collyer had failed to state a claim for postdeprivation denial of

---

administrative hearing, the rights of the parties to present their case by oral and documentary evidence, the right to counsel, the transcript of testimony and exhibits and pleadings constituting

the exclusive record for decisions, and the right to appeal to the courts. *Butz,* 438 U.S. at 513, 98 S.Ct. at 2914.

due process because he had adequate state remedies available. In this section, we do not address the issue of whether Collyer waived his right to bring a due process claim on account of the terms of the collective bargaining agreement because we find that Collyer had adequate state remedies.[11] In addition, we find that Ohio's deprivation process is constitutional.

### (a). Adequate state remedies.

■ Collyer is precluded from claiming procedural due process violations under § 1983 because adequate state remedies were available to him. Title 42 of the United States Code, § 1983 authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] a suit in equity" against "[e]very person who, under color of [state or federal] law," causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In this case, Collyer relies on the Fourteenth Amendment which prohibits state actors from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

■ The due process clause is properly raised where the one discharged has a property interest in his or her job. *See Lee v. Western Reserve Psychiatric Habilitation Center*, 747 F.2d 1062, 1067 (6th Cir.1984). Ohio Revised Code § 124.34 provides that a classified civil servant cannot be removed except for cause. Collyer, as a TPW was a classified civil servant and thus, had a property interest in his job.

■ Once we determine that the due process clause applies, we must determine whether a federal cause of action is the appropriate remedy for claimant's deprivation. *Sutton v. Cleveland*, 958 F.2d 1339, 1349 (6th Cir.1992). In *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), the Supreme Court held that when an individual is deprived of a property interest by the state due to the unauthorized failure of the state's agents to follow state procedure, due process is satisfied if the person had access to meaningful postdeprivation process. The Court extended *Parratt's* holding to deprivations of due process resulting from intentional but unauthorized acts of state employees in *Hudson v. Palmer*, 468 U.S. 517, 532–33, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). However, to pursue a § 1983 claim, the plaintiff bears the burden of demonstrating that the available state procedures were inadequate to compensate for the alleged unconstitutional deprivation. *See Parratt v. Taylor*, 451 U.S. at 543, 101 S.Ct. at 1917; *Sutton*, 958 F.2d at 1349.

■ In order to determine whether a due process violation has occurred, we must consider the entire spectrum of predeprivation and postdeprivation process provided by the state. *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Although the due process clause generally requires predeprivation process to prevent erroneous deprivations of property interests, if the state cannot foresee such deprivations, postdeprivation process is all the process that is required. *Id.* at 128–29, 110 S.Ct. at 985. Thus, we must first determine whether the risk of constitutional violation to the protected property interest was foreseeable, and second, whether there were predeprivation processes that could have effectively safeguarded those interests. *Id.*

■ In this case, the risk of deprivation involved the possibly erroneous deprivation of a civil servant's property interest in his or her employment. This is a clearly foreseeable risk that the State of Ohio attempted to address through statutory law and through the collective bargaining agreement with the Union. For instance, under Article 24 of the collective bargaining agreement negotiated

---

11. The lower court also ruled that the defendants were entitled to qualified immunity. However, because we decide here that Collyer had adequate state process available that precluded his procedural due process claims, we do not reach the issue of qualified immunity under this claim.

*See McLaurin v. Morton*, 48 F.3d 944, 947 (6th Cir.1995)(noting that the Court only reaches the issue of qualified immunity when the plaintiff has demonstrated a genuine issue of material fact supporting the constitutional claim).

between the State of Ohio and the Union, when the employer takes predisciplinary action, the employee is entitled to notice of the charges, an opportunity to be heard, the right to have a Union representative present and the right to receive supporting documents and witness lists.[12]

■ Not only did the collective bargaining agreement outline and provide the above process, process was actually provided in this case. Collyer asserts that he was denied predeprivation process prior to being placed on "unpaid leave of absence" in 1988. However, Superintendent Darling sent Collyer a letter on August 4, 1988, indicating that the BDC planned to place him on some sort of leave because Dr. Lingl had concluded that he could not effectively function as a TPW. Along with that letter were forms that Collyer was directed to use to select the type of leave he desired. Next, the BDC issued a notice of personal conference and the conference was held on August 15, 1988. Collyer attended the meeting with his counsel and a Union representative. There, Collyer was informed that Dr. Lingl had determined that he was unfit for work. After the conference, the BDC changed Collyer's status to "unpaid leave of absence" retroactive to the date of Darling's initial letter.

Collyer specifically relies on the Supreme Court's decision in *Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), as a basis for his procedural due process claims. In *Loudermill*, the Supreme Court emphasized that a pretermination hearing required oral or written notice to the employee of the charges, "an explanation of the employer's evidence and an opportunity [for the employee] to present his [or her] side of the story." *Id.* at 546, 105 S.Ct. at 1495. However, the Court went on to note that this necessary procedure need not be elaborate. *Id.*

Collyer claims the predeprivation process here was inadequate because the BDC did not give him sufficient notice of its intended action and because he was denied a copy of Dr. Lingl's report. First, although the BDC may not have followed the exact process contained in the collective bargaining agreement, Darling's August 4, 1988, letter followed by the formal notice gave Collyer sufficient advance notice of the intended disciplinary action and the hearing. As regards Dr. Lingl's report, *Loudermill* and its progeny do not require any more than adequate explanation of the reasons for the employer's action. Thus, it was sufficient for the BDC to inform Collyer that he was being "suspended" because the doctor determined him unfit due to a mental condition. Further, Collyer was not formally disability separated until 1990 and in the personal conferences that occurred prior to that date, he was provided more detailed information from Dr. Lingl's report.

Collyer also claimed that he deserved a hearing prior to having to submit to the psychiatric evaluation.[13] Former Ohio Civil Services rules required employees to submit to such a test in order to determine fitness for employment. Ohio Rev.Code Ann. § 123:1–38–04. Not only was such an exam a condition of Collyer's employment, we can find no support in the relevant case law to support a holding that an employee subjected to such an exam is entitled to any more predeprivation process than already prescribed here under Ohio statutes and the collective bargaining agreement.

■ Thus, we conclude that Collyer received sufficient predeprivation process under *Loudermill*. However, even if the predeprivation process here were inadequate, our inquiry is not over. Since we next conclude that Collyer had adequate postdeprivation remedies available, his § 1983 claims fail.

---

12. Article 24 (Discipline), § .01 provides the employer may discipline employees only if there is just cause to do so. Section 24.02 provides that where discipline is warranted, the employer must apply disciplinary action "commensurate with the offense" including, verbal reprimand, written reprimand, suspension and termination.

13. Involuntary medical examinations were not covered under the collective bargaining agreement and thus, Ohio statutes applied.

Collyer claimed that he was denied adequate postdeprivation process because the State Defendants mislabeled his suspension as a non-existent category not recognized by the collective bargaining agreement or the courts. As part of this claim, Collyer also asserts that the State Defendants somehow complicated the postdeprivation process by playing "shell games" with his remedies. An Ohio statute sets forth the following process by which employers may initiate a discharge and grant employees a full administrative hearing and judicial review:

In any case of reduction, suspension of more than three working days, or removal, the appointing authority shall furnish such employee with a copy of the order of reduction, suspension, or removal, which order shall state the reasons therefor. Such order shall be filed with the director of administrative services and state personnel board of review, or the commission, as may be appropriate.

Within ten days following the filing of such order, the employee may file an appeal, in writing, with the state personnel board of review or the commission. In the event such an appeal isfiled, the board or commission shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the board or commission, and it may affirm, disaffirm, or modify the judgment of the appointing authority.

In cases of removal or reduction in pay for disciplinary reasons, either the appointing authority or the officer or employee may appeal from the decision of the state personnel board of review or the commission to the court of common pleas of the county in which the employee resides in accordance with the procedure provided by section 119.12 of the Revised Code.

Ohio Rev.Code Ann. § 124.34. In addition, reinstated public employees are entitled to mandamus review to compel payment of backpay awarded by the SPBR. *State ex rel. Bispeck v. Board of Commissioners of Trumbull County,* 37 Ohio St.3d 26, 27, 523 N.E.2d 502, 504 (1988); *State ex rel. Martin v. City of Columbus,* 58 Ohio St.2d 261, 389 N.E.2d 1123 (1979). In such a proceeding, the defending state agency may plead in its defense that the SPBR abused its discretion when ruling in favor of the employee. *State ex rel. Ogan v. Teater,* 54 Ohio St.2d 235, 375 N.E.2d 1233 (1978).

As indicated earlier, Collyer's employment was governed by a collective bargaining agreement providing a five-step grievance procedure as the "exclusive method of resolving grievances" between employer and employee that culminated with final and binding arbitration. Chapter 4117 of the Ohio Revised Code provides that all employment matters such as wages, hours, or any deletion of existing provisions of a collective bargaining agreement are subject to the collective bargaining agreement. Ohio Rev.Code § 4117.08. Furthermore, Section 4117.10 of the Code provides that if a collective bargaining agreement covers a question in the contract that supersedes pre-existing civil service statutes and rules, and if the contract provides a remedy in final and binding arbitration for a question covered by the contract, employees are subject solely to the grievance procedure, and the SPBR or civil service commissions have no jurisdiction. *Id.*[14]

Collyer specifically argues that by categorizing his employment status as "unpaid leave of absence," a category not recognized in § 124.34 nor specifically included in the collective bargaining agreement, his postdeprivation process was unconstitutionally frustrated. To support his claim, Collyer argues that the facts here fit squarely within this

---

**14.** Ohio Revised Code § 4117.10(A) specifically states:

(A) An agreement between a public employer and an exclusive representative entered into pursuant to Chapter 4117 of the Revised Code governs the wages, hours, and terms and conditions of public employment covered by the agreement. If the agreement provides for a

final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure and the state personnel board of review or civil service commissions have no jurisdiction to receive and determine any appeals related to matters that were the subject of a final and binding grievance procedure.

Court's decision in *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339 (6th Cir.1992). In *Sutton*, a group of school bus drivers, discovered to have criminal records, were placed on "involuntary administrative leave" until their convictions were expunged. *Sutton*, 958 F.2d at 1342. The union grieved the employer's action pursuant to a collective bargaining agreement that provided a six member panel to hear the grievance. *Id.* Only if the panel was evenly divided could the grievance be taken to final and binding arbitration. *Id.* The grievance panel rendered no decision at all, rather, it proposed a settlement. *Id.* Sutton and several other drivers rejected the settlement, and although the employer initiated arbitration procedures, Sutton refused to arbitrate. *Id.* at 1342–43.

Instead of going to arbitration, Sutton filed appeals with the civil service commission and the SPBR; both appeals were dismissed. *Id.* Instead of appealing the dismissals as provided under Ohio Revised Code § 119.12 or § 124.34, Sutton sought a writ of mandamus from the Ohio Supreme Court requiring the SPBR to hear his appeal, however, his petition was denied. *Id.* at 1345 n. 5.

Sutton next filed in federal court under § 1983 alleging that his appropriate state law remedy was a civil service law appeal rather than arbitration under the CBA. *Id.* This Court concluded that Sutton's remedy was appeal by private counsel to the SPBR or civil service commission in cases where the six member panel failed to render an evenly divided decision. *Id.* After concluding that arbitration was not the proper process, the panel agreed with the government's concession that by mislabeling Sutton's employment status, they had prevented proper administrative review. *Id.* The court went on to note that:

> While the reasons underlying the refusal by the civil service commission and the state personnel board to address plaintiffs' appeals are not apparent, it is apparent that the disposition of plaintiffs' claims did not occur at a post termination hearing on the merits. When state remedies for re-

dress have been denied, the remedies cannot be said to be adequate.

*Id.* at 1349–50.

Although *Sutton* bears some similarity to the case at hand, it does not dictate Collyer's desired result. First and foremost, our holding in *Sutton* does not relieve plaintiffs alleging due process violations of their ultimate burden of demonstrating systemic inadequacy of state remedies. *See, e.g., Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)(holding that the state process is inadequate where a committed mental patient had no systemic opportunity to contest commitment because he lacked the capacity to voluntarily consent to treatment). Furthermore, in *Sutton*, there was no challenge to the postdeprivation process as set forth under Ohio law. The only claim was that by mislabeling their employment status, the defendants had denied them access to that process, a claim that defendants did not contest. Thus, the *Sutton* Court did not need to consider whether the wrongly labelled status could nevertheless have provided adequate access to postdeprivation process. Here, however, the parties disagree on the adequacy of process. Collyer knew that he had been forced to take "leave" even though leave was a status that could only be requested by the employee. Although the category itself may have been nonexistent, we believe the arbitrator would have looked behind the label to determine whether the employer action was a removal or suspension.

If Collyer had sought relief under the administrative process, it is also evident that the mislabeling of his status would not have automatically precluded his real claim. In fact, the Ohio Administrative Code Rules at the time contemplated the mislabeling of remedies. Rule 124–5–02 provided, "[i]f a reduction, removal or suspension is alleged and no 'section 124.34 order' has been filed with the state personnel board of review, the affected employee should prove, by preponderance, that the reduction, removal or suspension has occurred." Given that Collyer knew he had been forcibly removed, had he filed an administrative claim, he could have easily met his burden of proof. Further-

more, the collective bargaining agreement in this case provided for final and binding arbitration with a series of grievance steps that avoids the problem created in *Sutton*, where a divided panel could draft a settlement. Because the collective bargaining agreement provided final and binding arbitration and since in such instances the SPBR had no jurisdiction, had Collyer filed a claim seeking administrative review, the SPBR would have had to look at his claim carefully to determine whether it had jurisdiction.

In light of the above, we also find unpersuasive Collyer's claim that he did not pursue his grievance because he was told he could not by an unnamed Union official. Collyer himself thought that he had been removed, the collective bargaining agreement clearly covered removals and Collyer was represented by counsel throughout. Equally unpersuasive is Collyer's assertion that he did not pursue an administrative claim because an unnamed person from the SPBR informed him that that body did not have jurisdiction. Collyer has failed to produce enough evidence to support a jury finding in his favor on this ground.

Moreover, Collyer was actually successful in receiving postdeprivation process in part through the collective bargaining agreement and in full by the SPBR. In *Sutton*, this Court was concerned with the way in which the state deprived plaintiffs of all postdeprivation process. Although the court seemed to focus on the mislabeled employment status, it also had before it a record of unexplained dismissals from every forum of review to which Sutton appealed. Here, Collyer never made the attempt to appeal the 1988 employment action through the collective bargaining agreement or through Ohio's administrative process. In any event, when Collyer was formally disability separated in 1990, he pursued a grievance and filed an administrative claim. Thereafter, Collyer received a full adversarial administrative hearing complete with representation, presentation of documentary and oral evidence and was ultimately successful in his claims. Ultimately, the SPBR reviewed the actions taken by the BDC and ordered Collyer reinstated with back pay as of the August, 1988, date.

Collyer complains that the process described above was still inadequate because even though the SPBR ordered him reinstated from August, 1988, the BDC did not reinstate him earlier than 1990. Moreover, his appeal of their noncompliance to the SPBR was dismissed for lack of jurisdiction. He argues that a state action in mandamus was not an adequate remedy because it provided extraordinary relief when there was no other remedy at law and that since he had a remedy at law, this § 1983 action, he could not seek mandamus. We find this argument thoroughly unpersuasive. Ohio law clearly provides mandamus review for exactly Collyer's claim as is evident from case precedent rendered years before the acts complained of here. Furthermore, Collyer's assertion that § 1983 provides a remedy at law precluding a *state* action in mandamus is circular at best. Collyer has not demonstrated that there is inadequate state review of administrative procedures, *see Meyers v. City of Cincinnati*, 934 F.2d 726, 731 (6th Cir.1991), and thus, his claims must fail.

After reviewing the above claims and Ohio law, it is clear that Collyer had adequate remedies available to vindicate his due process claims. Thus, he cannot seek relief in this Court.

#### (b). Ohio process is constitutional.

Finally, Collyer argues that Ohio's postdeprivation process is unconstitutional because the process itself is unclear and that even if he received some process, postdeprivation process requires the procedures be clear and in place before any deprivation occurs. We disagree.

■ In *Hudson*, the Court distinguished deprivations caused by random and unauthorized acts from those arising from acts taken pursuant to established state procedure. *Hudson*, 468 U.S. at 532–33, 104 S.Ct. at 3203. In claims alleging the state acted in accordance with established state procedure, due process is not satisfied even if meaningful postdeprivation process is available. *Lo-*

*gan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Though the road to postdeprivation process as provided by the State of Ohio was not without some bumps, the procedures in place are sufficiently "meaningful" to pass constitutional muster. Ohio law makes clear that Collyer either had to resort to the grievance or administrative process. Although he claims he did not know which process applied under his circumstances,[15] he initially made no effort to do either but eventually received process under both. Accordingly, Collyer's procedural due process claims may not be considered by this Court.

### C. First Amendment

 Collyer sought relief for First Amendment violations purportedly committed by the State Defendants, Drs. Lingl and Rizk.[16] He claims that he was discharged in retaliation for his various reports and committee activities from 1982 to 1986 and that his speech formed the basis for his referral to psychiatrists.[17] The district court granted summary judgment in favor of all defendants on the grounds of qualified immunity although it also ruled that Collyer had failed to present "any evidence that any adverse action ... taken against him was in retaliation for protected speech." The district court granted Cobb's and Darling's motion for summary judgment on the grounds that Collyer "failed to state a claim either by way of sufficient proof or because no First Amendment rights [were] implicated." The court also granted summary judgment in favor of Darling, Johnson and Laney on the grounds Collyer had not produced "any evidence that any action taken by the defendants violated any right to freedom of association." We conclude that the lower court was correct to grant summary judgment on Collyer's First Amendment claims because the record reveals insufficient evidence upon which a reasonable jury could conclude that defendants in any way abridged Collyer's First Amendment rights.[18]

 It is well established that in order to make a claim that an employer's actions violated the First Amendment, a plain-

---

**15.** Collyer argued that he was not sure of what process he was entitled to because he was claiming that his separation was retaliatory. He did not make this argument to the lower court. However, it nevertheless makes little sense that Collyer would therefore pursue neither forum's process simply because he thought those forums would not consider his retaliation claim. The fact remained that Collyer believed he had been involuntarily removed and removal was clearly covered by both forms.

**16.** It is unclear whether Collyer intended to include Attorney General Fisher and the SPBR Members in his First Amendment claims. The lower court granted the Attorney General and the SPBR Members absolute immunity on Collyer's claims for money damages. Although the lower court was incorrect to grant absolute immunity to the Attorney General who did not raise that defense, the Attorney General and the SPBR Members were properly granted summary judgment as there is simply insufficient proof on the record that any of their actions violated Collyer's First Amendment rights.

**17.** Collyer also claims that he was prevented from attending union and other meetings on BDC grounds after having been placed on leave in 1988. However, since Collyer did not raise this claim until his 1992 complaint, his claim is barred by the applicable statute of limitations. We note that even if the claim was timely filed,

Collyer has not alleged nor presented sufficient evidence upon which this Court could find that he was excluded because of his speech, affiliation or point of view.

**18.** When motions for summary judgment involve the defense of qualified immunity, we must first determine whether the plaintiff has stated a claim for relief and next determine whether plaintiff has demonstrated a genuine issue of material fact that a constitutional violation was committed by the defendant. *McLaurin*, 48 F.3d at 947. Normally, at the second prong of qualified immunity determinations involving motions for summary judgment, we would also consider whether the defendant officials should have known that their actions violated the constitution. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). However, since immunity only precludes monetary damages against officials in their individual capacities, when there are claims for injunctive or declaratory relief, this Court must address the claim on the merits. *See, e.g., Cagle v. Gilley*, 957 F.2d 1347 (1992). Since Collyer also makes claims for injunctive and declaratory relief, instead of addressing whether the law was clear at the time of the alleged violation, we focus on whether Collyer has asserted a genuine issue of material fact. Since we conclude that Collyer's claims fail to pass muster under the summary judgment standard, we affirm the district court's holding in defendants-appellees' favor.

tiff must show that he or she was discharged because of speech involving a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rahn v. Drake Center, Inc.,* 31 F.3d 407 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995).[19] In evaluating Collyer's First Amendment claim, we must only consider the speech for which Collyer was allegedly disciplined. *See Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). It follows that in speech cases of this type, in order to survive a motion for summary judgment, it is not enough to simply demonstrate that some adverse employment action followed speech that the employer would have liked to prevent or eliminate. *See Wright v. Illinois Dep't of Children & Family Services,* 40 F.3d 1492, 1500 (7th Cir.1994).

Collyer asserts that all or nearly all of the defendants conspired to deprive him of his First Amendment rights. The crux of his claim is that several defendants placed false information in a "secret [personnel] file" in retaliation for his efforts to report client endangerment and employee complaints, and that other defendants used this information to remove him from his job in order to silence his complaints. The incidents Collyer asserts provide the basis for his First Amendment claims include: (1) his many reports of possible "abuse or neglect" of BDC residents to his supervisors through the Human Rights Committee, the Health and Safety Committee, and defendant-appellee Vann; (2) his criticism of the BDC's emergency response policy; (3) his involvement in a grievance procedure brought on behalf of Jehovah's witnesses who complained of policies which violated their religious beliefs; and (4) his suggested adoption of a communicable disease policy that included AIDS along with his refusal to reveal the names of staff members with AIDS. With regards to

his efforts to report client abuse, Collyer's strongest evidence of motive on the defendant's part is the media attention directed at the BDC and its sister facilities in the early to middle 1980s. He asserts that the center was under intense pressure because of outside scrutiny over numerous incidents of client abuse and that their efforts to punish him were lodged only because he complained so often about possible client abuse.

■■■■■ The standard for proving a civil conspiracy is as follows:

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks,* 771 F.2d 935, 943–44 (6th Cir.1985).

The lower court was correct in concluding that the defendants were entitled to summary judgment on Collyer's claims because Collyer has not shown that any individual defendant acted as a result of Collyer's speech, nor is there evidence of a single plan to violate Collyer's First Amendment rights. The link Collyer attempts to establish between the defendants is through his personnel file or as he has called it, the "secret file." It appears that the file contained, at various points in time, performance evaluations, job descriptions and evidence of between five and seven suspensions. The file also contained a 1986 report completed by an independent investigator concluding that Collyer's claims were too numerous to be untrue and noted that Collyer only appeared to re-

---

**19.** Whether the speech at issue is a matter of public concern is a question of law subject to *de novo* review. *Rahn,* 31 F.3d at 411. If the court determines the speech does not touch upon matters of public concern it need not go any further in its inquiry. *Id.* However, as discussed *infra,*

our inquiry here stops short of this threshold determination since Collyer has failed to sufficiently demonstrate that any of the named defendants acted or conspired to act on the basis of his speech.

ceive suspensions after engaging in union activity. Also included in this file were records of Collyer's suggestions for improvements at the BDC including the suggestion that the center purchase a machine similar to the one used by farmers to remove "horse turds" for the removal of BDC "client turds."

Collyer alleges that the defendants created his file improperly, filled it with falsehoods, and used it to support their actions which were really aimed at punishing Collyer's protected speech. However, a review of the record does not support Collyer's claims. First, there is no way that a reasonable jury could conclude that Collyer's file was handled in an unusual manner. The file contained ordinary information and although there were reports disagreeing with most of his complaints, they indicate no more than a difference in opinion. Second, although the BDC was under intense public scrutiny in Cleveland, these events and newspaper coverage occurred in the early to middle 1980s. There is no allegation that Collyer himself ever made reports or ever threatened to make reports to the media or anyone else in the general public. Furthermore, Collyer was in fact reprimanded for not reporting all instances of suspected abuse and for not doing so according to procedures established by the center. It was only after his reprimand that his reporting dramatically increased. Furthermore, although there is some dispute as to how many times Collyer was suspended, he concedes that he was suspended at least five times, including two suspensions for reading in the classroom, once for leaving clients alone in the classroom, and once for smoking in the classroom. While Collyer alleges some of these suspensions were pretextual, he concedes that his poor performance evaluations began during his probationary period, *before* the speech he alleges was at the root of defendants' actions. In fact, Collyer's performance during probation was poor enough to have caused the reviewing office to recommend he not be hired full time. In addition, the types of concerns enunciated at his first evaluation are consistent with some of those enunciated later by other reviewing persons.

Collyer's strongest conspiracy claim is against Laney, Darling and Ostroff. Yet, even given the roles these defendants played in the events at issue, Collyer fails to present enough evidence to establish conspiracy.

First, although Darling and Ostroff had full access to Collyer's file including the report of the independent investigator, there is not enough evidence on the record to support a finding that they acted to silence Collyer's speech. The report and all events alluded to in the report occurred between 1982 through 1986, two years before Darling entered the picture and four years before Ostroff. Second, even though the record supports a finding that both Darling and Ostroff had the opportunity to discuss Collyer with persons at the BDC who had worked there before their tenure and who were familiar with Collyer, such as Laney, there is not enough evidence on this record to establish that there was a plan to terminate Collyer because of his speech. Specifically, although Laney headed the Health and Safety Committee when Collyer was a representative and allegedly knew Dunns and Eister, who Collyer claimed prevented him from attending meetings because of his union activity,[20] a review of the record presents no evidence, other than Collyer's allegations, to support a contention that Laney attempted to exclude him from attending Health and Safety Committee meetings because of his speech. All that Collyer has demonstrated is that Laney disagreed with some of his complaints after investigation. After Darling entered as Superintendent in 1988, at Darling's request, Laney compiled a list of documents regarding Collyer and his job description with the help of Sivic and Solomon. The file contained evaluations and job descriptions. Laney was also responsible for getting doctors names at Darling's request and was present at the meeting attended by Collyer and Darling where Collyer was informed that he would have to submit to a psychological evaluation to determine fitness for work. Aside from the above, Collyer's only remaining evidence of conspiracy to violate his First Amendment rights is meritless. In review-

---

20. Neither Dunns nor Eister were named as defendants.

ing the above, it is clear that Collyer has not met his burden.

Collyer's claims of conspiracy are even weaker after considering the conduct Darling noticed on the part of Collyer. Darling observed Collyer performing duties not customary to the position for which he was hired. He noted Collyer walking back and forth in disheveled ill-fitting clothing on a regular basis, a claim that Collyer only contests in degree and explains as necessary attire given his line of work. He reviewed Collyer's file which contained documents revealing a less than perfect work history, troubling behavior, and investigative reports of his numerous allegations and complaints. When asked, two employees informed Darling that Collyer was placed in his position because there was concern that his tendency to have angry outbursts for no apparent reason was dangerous for patients. Darling also knew that the previous Superintendent and Ohio Department of Administrative Services Director made incomplete attempts to set up an involuntary psychological evaluation of Collyer in the past. After Darling arrived, Collyer reacted very angrily to the BDC's request that he fill out a job description, a task commonly asked of employees. Only after reviewing and witnessing all of the above did Darling decide that Collyer should be evaluated for fitness of duty pursuant to Ohio law.

■ Given Collyer's inability to establish a conspiracy amongst the above-named defendants, his claims against Ostroff also fail.

As of Ostroff's first day as Superintendent of the BDC, he had before him Collyer's record and a doctor's evaluation determining that Collyer was unfit for work as a TPW. In ordering a second evaluation from a different doctor, Ostroff then had two independent diagnoses of paranoid personality disorder and unfitness for work. In addition, initially, Ostroff had no evidence of a contrary medical assessment and no evidence that Collyer sought any type of treatment. Although Collyer eventually submitted some form of contrary medical opinion, the first submission was a brief letter from a doctor and the final two reports were not submitted until approximately 1992. In light of the above, we cannot conclude that Ostroff acted according to a plan to eliminate Collyer based on speech.

■ The claims against the remaining States Defendants Cobbs, Flaherty, Manuel, Perry, Schweitzer and Gulyassy likewise do not survive summary judgment. These defendants played minor roles in the events at issue and the record does not support a finding that they acted either individually or according to a single plan to eliminate Collyer on the basis of speech.[21]

■ The final important link in Collyer's conspiracy theory is that of the doctors. However, on these claims Collyer's theory also fails. First, it is clear from the record that neither doctor is a state actor and thus cannot be sued under § 1983.[22] In

21. Collyer named Cobbs as a defendant although Cobbs' only discernable connection to this First Amendment claim is that he was involved in one or more altercations with Collyer. However, the record supports nothing more than a finding that Cobbs perhaps disliked Collyer. In fact, the evidence before us best supports a finding that Collyer was prone to unpredictable angry outbursts with Cobbs and others. There is no indication that Cobbs acted pursuant to a single plan to eliminate Collyer. Thus, Collyer's First Amendment claims against Cobbs fail. There is similarly insufficient evidence of motive or plan to eliminate Collyer among the remaining defendants. William Flaherty, the Director of the Ohio Department of Administrative Services, affirmed the involuntary disability separation order in February 1990. Jerome C. Manuel, the Director of the Ohio Department of Mental Retardation, formulated personnel policies at the Department's facilities and reviewed the implementation of all personnel decisions

made by the BDC Superintendent and Director of Human Services. Stephen A. Perry was appointed Director of Ohio Department of Administrative Services in 1991. Jocelyn Schweitzer was the Personnel Director for the BDC from 1990 to 1991 and was responsible for implementing all personnel decisions of the BDC Superintendent. Schweitzer answered many of Collyer's personnel questions and sent all of the notices of personal conference. Steve Gulyassy, Personnel Director at the Ohio Department of Mental Retardation, was responsible for determining Collyer's back pay and conducted at least one meeting to determine whether to return Collyer to the TPW position.

22. In the lower court, only Dr. Rizk made this argument. It is very difficult to determine, given the very conclusory and cursory fashion in which the lower court judgment was rendered, exactly what the lower court concluded with regards to

order to be subject to suit under § 1983, defendant's actions must be fairly attributable to the state. *Lugar*, 457 U.S. at 936, 102 S.Ct. at 2753. There are three tests employed by the courts to determine whether the challenged conduct is fairly attributable to the state: (1) the public function test, (2) the state compulsion test and (3) the symbiotic relationship or nexus test. *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir.1992). The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Id.* at 1335. The state compulsion test "requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id.* Finally, under the symbiotic relationship test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.*

Here, Collyer asserts that even though Dr. Rizk and Dr. Lingl are not state employees, that the Supreme Court's decision in *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), in which the Court utilized the public function test, should extend § 1983 liability to these two physicians. In *West*, the Supreme Court held that a private physician who had a long term contract with the State of North Carolina to provide medical services to its prisoners at a prison hospital on a part-time basis acted under color of state law within the meaning of § 1983. *West*, 487 U.S. at 54, 108 S.Ct. at 2258. The defendant physician was paid $52,000.00 annually to operate two clinics each week at a prison hospital. *West*, 487 U.S. at 44, 108 S.Ct. at 2252. In addition, the doctor had to adhere to a manual governing prison health care in the North Carolina system that identified the provision of health services as a joint effort with the state which could only be achieved through "mutual trust and cooperation." *West*, 487 U.S. at 51, 108 S.Ct. at 2256. The Court also noted that the American Medical Association Standards for Health Services in Prisons (1979) provided that doctors and prison officials were to act jointly and in a cooperative effort. *Id.* The court concluded that since the state had a duty to provide health care to its prisoners, it had simply transferred that responsibility to the physician. *West*, 487 U.S. at 54–55, 108 S.Ct. at 2259–60.

Dr. Rizk and Dr. Lingl are, and were at the time of diagnosis, private doctors. Each contracted with the state, on a particular occasion, to examine Collyer, a state employee. There is no evidence of any sort of agreement between either doctor and the state acknowledging a shared goal such as existed in *West*. Under Ohio Administrative Code Rule 123:1–33–04, the Ohio Department of Administrative Services was required to designate the practitioner rather than the BDC itself. This suggests that state intended to ensure that the doctors rendered an independent decision.[23] In effect, both doctors had the obligation to independently determine whether Collyer was mentally fit to effectively function as an employee. Given the absence of a contract or any evidence that Dr. Rizk and Dr. Lindl did not act independently in their task, it is clear they are not state actors.

▮ Given the private status of both doctors, the absence of a contract indicating the need for a collaborative effort between the

Dr. Lingl as his name is not mentioned at any time within the court's ruling. However, it appears that Dr. Lingl argued below that he thought he was sued for conspiracy under § 1985(3) as a private actor. On appeal, Collyer argued in the alternative that both doctors, although private actors, should be treated as state actors because they performed functions fairly attributable to the state. Because the record supports a finding that Dr. Lingl is not a state actor for purposes of § 1983, and to the extent the lower court dismissed all § 1985(3) claims against Dr. Lingl (discussed *infra*), the lower court properly dismissed all claims against Dr. Lingl.

23. Although it appears the BDC may have played more of a role in the selection of one of these doctors than Ohio law provided, the record establishes that each doctor was certified by the Ohio Department of Administrative Services and there is no indication that either doctor was previously known to any of the defendants.

doctors and the state, and given the independence with which the doctors completed their tasks, the ruling of the district court must be affirmed. Even if these doctors should be considered state actors, there is no evidence that either played any role in the hearings, threats, or other acts of which Collyer complains. In addition, as indicated below, there is no proof of conspiracy.[24]

Collyer also attempts to reach the doctors' conduct through § 1985(3) as private conspirators. To demonstrate a private conspiracy under § 1985(3) the plaintiff must prove (1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen. *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995). The plaintiff must also show the conspiracy was motivated by racial, or other class based animus. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). The lower court based its ruling on the determination that Collyer had not asserted membership in any protected group.[25] However, even assuming he has met all of the requirements under § 1985(3), there is no evidence on the record to support a finding that either doctor acted in tandem with some plan to eliminate Collyer on the basis of speech. In fact, the record supports the exact opposite finding. Both doctors were chosen through a fairly random process. Neither doctor was to treat Collyer—they were only retained to diagnose Collyer. Although both had access to Collyer's file, as indicated earlier, simple access to the file is not enough to support a finding that they acted on the basis of Collyer's

speech. Each rendered a diagnosis of paranoid personality disorder and concluded Collyer was not fit to perform as a TPW. Although Collyer makes much of the medical procedures used to render these decisions, Collyer only provided contrary medical evidence as late as a year after the original evaluation. Finally, although the evaluations Collyer eventually submitted are more favorable to him, neither conclusively contradicts the earlier evaluations. Thus, the fact that Ostroff did not grant them much weight in his determination does not help Collyer's claim.

In light of the above, Collyer's claims that those who acted on the doctors' evaluation did so for impermissible reasons are without merit. There is no dispute that the TPW positions required persons who could help the profoundly retarded through basic daily activities and skills. Given these duties, Darling's concerns based upon his own observation and investigation seem well founded and do not support a finding that he acted instead on the basis of halting unwanted protected speech. Furthermore, once Dr. Lingl rendered his evaluation it was reasonable for Darling to remove Collyer in some way from his position. Without sufficient evidence that Collyer was fit for work, it was reasonable for Ostroff to disability separate Collyer. In short, this record simply does not support a finding that the defendants acted on the basis of Collyer's speech or that they conspired to do so.

### III.

For the reasons above, the decision of the Honorable Paul R. Matia is AFFIRMED.

---

24. The district court also chose to treat Collyer's claim against Dr. Rizk as a state law defamation claim and found in Dr. Rizk's favor. Given our ruling as to Dr. Rizk under §§ 1983 and 1985(3), we do not address the possible state claim except to note that the lower court's ruling appears sound.

25. Collyer argued that he demonstrated class based animus because many of the defendants acts were intended to injure and deprive severely and profoundly retarded adults of their constitutional rights. Because we conclude Collyer has failed to demonstrate conspiracy or motivation to act on the basis of protected speech, we leave this issue for another day.