**Kim WILLIAMS, Plaintiff,**

v.

**Officer FNU PAYNE, Officer FNU Lasseigne, Sergeant FNU Cosby, City of Pontiac, Donald Brock, D.O., and Pontiac Osteopathic Hospital, Defendants.**

No. 98–CV–74761.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 3, 1999.

---

Fred B. Walker, Royal Oak, MI, for plaintiff.

Leon B. Jukowski, Pontiac, MI, Stephanie L. Pappas, David M. Ottenwess, Detroit, MI, for defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

This case involves claims by the Plaintiff, Kim Williams, who contends, *inter alia,* that the Defendants[1] encroached upon his civil rights, in violation of 42 U.S.C. § 1983 and existing state laws. At issue are the motions for summary judgment and dismissal that have been filed by the Defendants, all of whom seek dispositive relief pursuant to Federal Rule of Civil Procedure 12(b)(6) and 56. For the reasons that have been set forth below, their respective applications for relief will be granted in part and denied in part.[2]

## I. STATEMENT OF FACTS

In his Complaint, Williams asserts that he was wrongfully arrested on drug charges by Payne and Lasseigne in front of his home in Pontiac, Michigan on April 5, 1998.[3] Immediately prior to his arrest, these officers perceived that Williams had consumed some illegal drugs in an ostensible effort to avoid detection and reduce the probability of a successful prosecution against him. Payne, after finding some evidence of marijuana on the ground near the site of the arrest, ordered Williams to open his mouth for an inspection.[4] Immediately thereafter, Williams was transported to the municipal police station where, among other things, he was tested for traces of cocaine. (Payne Dep. at 23:25–24:9, 26:4–7:14; Williams Dep. at 11:20–12:16.) When the test yielded a positive result, Williams contends that Payne orally advised Cosby, his supervising sergeant, that "the little _____ swallowed some crack cocaine." In response, Cosby allegedly instructed Payne to "take his little _____ down to Pontiac Osteopathic Hospital and have his stomach pumped." (Williams Dep. at 11:10–14; *see also* Cosby Dep. at 14:24–15:2.)

1. During all of the times that are relevant to this proceeding, (1) the Defendants, Payne, Lasseigne and Cosby, were law enforcement officers in Pontiac, Michigan and (2) the Defendant, Donald Brock, was a medical doctor who was employed by the Pontiac Osteopathic Hospital. Their corporate employers, the City of Pontiac, Michigan and the Pontiac Osteopathic Hospital, have also been named as Defendants in this cause of action.

2. An evaluation of the motion of the Defendants, Payne, Lasseigne, Cosby and the City of Pontiac, will be discussed under Section III of this opinion. A similar examination of the issues that have been raised by the Defendants, Brock and the Pontiac Osteopathic Hospital, in their motion will be conducted under Section IV of this opinion.

3. Williams was arrested for his possession of marijuana and crack cocaine, as well as resisting arrest.

4. Although Williams complied with Payne's directive, the parties have expressed differences of opinion as to whether any evidence of drugs was uncovered in or around his mouth at the time of the arrest.

Williams was transported to the emergency room of the Pontiac Osteopathic Hospital by Payne and Lasseigne where they conferred with Brock, a physician, who was on duty at the time of their arrival.[5] (Payne Dep. at 40:5–18.) During their conversation with Brock outside of Williams' presence, Lasseigne expressly asked the doctor to initiate a stomach pumping procedure, saying "we would like to get some evidence . . . ." (Brock Dep. at 45:7–11, 48:7–12, 48:20–49:4). Acting upon Brock's directive, Williams' stomach was forcibly and involuntarily pumped by the medical personnel.[6] Thereafter, Williams was involuntarily catheterized to retrieve a urine sample. There was no warrant for either procedure. (Brock Dep. at 51:1–2.) At the conclusion of these medical procedures, Williams was ultimately placed in the Oakland County Jail where he remained for a period of two days until his release from custody. This law suit followed.

## II. *STANDARD OF REVIEW*

The Defendants have captioned their pleadings as a motion for summary judgment under Federal Rule of Civil Procedure 56 on some claims and an application for the dismissal of other claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Where, as here, a party presents matters outside the pleadings, a motion that has been filed under Rule 12(b)(6) will be treated as one for the entry of summary judgment under Rule 56. *See* Fed. R.Civ.P. 12(b).

Federal Rule 56(c) permits this Court to grant a summary judgment only if the pleadings and the evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party will satisfy its burden only if the evidence is such that a reasonable jury could find only for the movant. *See id.*; *id.* at 250, 106 S.Ct. 2505 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

In considering a request for the entry of a summary judgment, the Court is obliged to examine all pleadings or evidentiary submissions in the light that is most favorable to the non-moving party. Fed. R.Civ.P. 56(c); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991). However, hearsay evidence may not be considered by the Court when evaluating the merit, if any, of a summary judgment motion. *Jacklyn v. Schering–Plough Healthcare Prod. Sales Corp.,* 176 F.3d 921, 927 (6th Cir.1999). By the same token, "[i]f a party fails to object . . . to the affidavits or evidentiary materials submitted by the other party . . ., any objections to the district court's consideration of such materials are deemed to have been waived." *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994). It is neither the obligation nor the responsibility of this Court to weigh the facts. *60 Ivy Street*

---

5. Payne had been known by Brock on a professional basis prior to April 1998 because he "frequently comes into the emergency department . . . with police matters." (Brock. Dep. at 7:16–17.) Brock had also known Cosby professionally because of his prior visits to the emergency room with detainees. (Brock Dep. at 7:1–12.)

6. According to the Pontiac Osteopathic Hospital records, "[the patient was] placed in 4–point restraint[s]" and thereafter involuntarily introduced to a stomach pumping procedure

(to wit, a gastric lavage). (Def.'s Mot. Summ.J. Ex. H; Brock Dep. at 85:21.) Lasseigne acknowledged that he had helped hospital personnel strap Williams to the bed prior to the commencement of the procedure. (Lasseigne Dep. at 26:3–27:15.) Lasseigne also recalls that Payne assisted him with the restraint efforts. (Lasseigne Dep. at 26:18–27:12.) However, Payne has a different account, believing that he did not enter the operating room until after the restraints had been placed on Williams. (Payne Dep. at 44:8–9.)

*Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir.1987). Rather, the Court determines only "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

Once the movant has satisfied its initial burden, the non-moving party must take affirmative steps to avoid the entry of a summary judgment. *See* Fed.R.Civ.P. 56(e). A mere scintilla of supporting evidence is insufficient. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). Additionally, if a party fails to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" the entry of a summary judgment is mandatory. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On the other hand, if this Court determines that (1) a genuine issue of a material fact exists as to a particular claim, or (2) the moving party is not entitled to judgment as a matter of law on a particular claim, it may deny a summary judgment on that claim even while granting a partial summary judgment on any remaining claims. Fed.R.Civ.P. 56(d). Thus, each individual claim must be analyzed under the summary judgment standard.

III. *CLAIMS BY WILLIAMS AGAINST PAYNE, LASSEIGNE, COSBY & THE CITY OF PONTIAC*

This section addresses only the motion that was filed on July 7, 1999 by the Defendants, Payne, Lasseigne, Cosby and the City of Pontiac, requesting the entry of a summary judgment against Williams on all claims.

A. *Concessions By Williams*[7]

B. *Violations of Ministerial Duties*

Williams contends that Payne, Lasseigne and Cosby failed to perform their ministerial duties as law enforcement officers when they collectively violated the law and encroached upon his constitutional rights as a United States citizen. However, Williams has not presented any evidence or authority upon which to ground his argument that these Defendants violated any of the ministerial duties which were required of them as police officers.

■ It is well settled that ministerial duties are, in general, those obligations that attach to an office and do not require an exercise of judgment or discretion. *See, e.g., Commonwealth of Pennsylvania v. Coxe,* 4 U.S. (4 Dall.) 170, 192, 1 L.Ed. 786 (1800) ("[T]he secretary of the land-office, though a constituent member of the board of property, is ... a ministerial officer, bound by the decisions of the board, though contrary to his own opinions. His ministerial duties ... are stated in the several laws ... and they have received a practical exposition, which devolves on him the care of preparing patents for the governor's signature, and the seal of the state").

■ Although Williams argues that Mich.Comp.Laws § 691.1407 governs his claim against these Defendants for their alleged violations of their respective ministerial duties, this statute only discusses governmental immunity and its limitations.

---

7. In responding to the Defendants' dispositive motions, Williams has conceded that "the Michigan Constitutional Claims under Counts II and III and the State Law claim as to Count IV should be dismissed ...." (Pl.'s Resp. to Def's Mot.Summ.J. at 9.) Those claims, to which Williams has made reference, asserted (1) violations of state constitutional prohibitions on grounds of unreasonable searches and seizures and cruel or unusual punishment and (2) tortuous false imprisonment. This Court honors his concessions and, without considering any material other than the pleadings for the purpose of those claims, dismisses these charges as identified by him above without prejudice. The Court does not address the merits of these claims and neither endorses nor rejects the parties' reasoning.

More significantly as it pertains to the Defendants in this action, § 691.1407 does not address the ministerial duties that attach to any relevant office or position, such as that of a law enforcement officer. Williams' allegations improperly characterize imperatives, which proscribe all violations of any federal or state substantive laws, as ministerial. (Compl.47–50.) These are not ministerial duties. Rather, they are fundamental constitutional and legal requirements. On the basis of the present record, this Court cannot find any support for his claim of a violation of ministerial duties by Payne, Lasseigne and Cosby, and, therefore, grants a summary judgment in their favor on this issue.

### C. *Intentional Torts By Payne and Lasseigne*

Governmental agents in Michigan receive significant immunity under Mich. Comp.Laws § 691.1407 from general tort liability. However, this immunity does not extend to intentional torts. *See* Mich. Comp.Laws § 691.1407(2)(c); *Sudul v. City of Hamtramck*, 221 Mich.App. 455, 458, 562 N.W.2d 478 (1997) ("We especially also hold that an individual employee's intentional torts are not shielded by our governmental immunity statute...."). With regard to the question of whether Payne and Lasseigne committed intentional torts, an examination of Williams' testimony in its best light supports a rejection of the Defendants' motion for summary judgment, as the subsequent evaluation by the Court under subsections 1 (Assault & Battery) and 2 (Intentional Infliction of Emotional Distress) reveals.

### 1. *Assault and Battery*

In their motion, the Defendants maintain that there is no evidence to support Williams' claim for assault and battery. They submit that the law in Michigan authorizes a police officer to apply reasonable force when making a lawful arrest. Here, the movants contend that there is no

evidence that either of them (1) used unnecessary force when they arrested Williams, or (2) were involved in the challenged medical procedure at the Pontiac Osteopathic Hospital.

Under Michigan law, an assault is "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 189 Mich.App. 110, 119, 472 N.W.2d 16 (1991). Battery, according to the *Espinoza* court, is "the wilful and harmful or offensive touching of another person which results from an act intended to cause such contact." *Id.*

Here, Williams has presented evidence which, if correct, creates a genuine issue for trial on the issues of assault and battery in two circumstances. First, genuine issues of fact remain as to whether Payne and Lasseigne committed an unlawful arrest. "An arrest can be an assault if the arrest is illegal." *People v. Smith*, 235 Mich.App. 235, ——, 597 N.W.2d 247, 249 (1999) (citing People v. Eisenberg, 72 Mich.App. 106, 111, 249 N.W.2d 313 (1976)). On the other hand, the use of reasonable force in the course of a lawful arrest does not constitute assault. *See Delude v. Raasakka*, 391 Mich. 296, 215 N.W.2d 685 (1974).

According to the pleadings in this cause, Payne and Lasseigne, while in their patrol car, approached Williams and his friends, all of whom were standing on a public street in Pontiac, and ordered them to disperse immediately or be ticketed for loitering. Although the group ostensibly complied with their directive, someone made a remark that the officers considered to be insulting. In response, the officers turned the patrol car around, parked in a nearby driveway, and exited their vehicle. Payne ran after, tackled, and subsequently arrested Williams.[8] This account of the

---

8. The officers testify to a different set of facts. The question who is giving an accurate representation involves issues of credibility that must be resolved by the trier of fact.

encounter between the two officers and Williams raises a genuine issue of a material fact as to whether Payne and Lasseigne committed an unlawful arrest.

Second, there is additional evidence that Lasseigne acted in concert with other persons, possibly including Payne, to strap Williams to a bed upon which he would undergo an involuntary stomach pumping procedure. It is clear from the record that Williams did not consent to the strapping. In fact, it is readily apparent that he was adamant in his opposition to having his stomach pumped. The officers maintain that such force was reasonable under the circumstances. (Def.'s Reply Br. at 2.) A resolution of this issue requires a fact-based judgment about the circumstances in order to determine (1) if the purpose of the restraint (to wit, the stomach pumping) was a proper goal and (2) whether the means that were used to affect the medical procedure were reasonable. If the trier of facts answers those questions in the negative, an action for assault and battery against the perpetrators will lie.

Hence, the request for summary judgment relief by Payne and Lasseigne on Williams' assault and battery claim must be rejected.

### 2. *Intentional Infliction of Emotional Distress*

In their motion, the Defendants deny that they engaged in any conduct that was extreme and outrageous. It is their position that they could not have subjected Williams to any form of intentional infliction of emotional distress in their respective dealings with him.

Although the Michigan "Supreme Court has yet to recognize formally the tort of intentional infliction of emotional distress," *Sudul*, 221 Mich.App. 455, 462, 562 N.W.2d 478, the Michigan Court of Appeals has done so. In 1999, a Michigan appellate court declared that the elements of this tort are (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.

*Smith v. Calvary Christian Church,* 233 Mich.App. 96, 113, 592 N.W.2d 713 (citing Haverbush v. Powelson, 217 Mich.App. 228, 234, 551 N.W.2d 206 (1996)). "Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted).

■ The conduct, about which Williams complains, has long been recognized as atrocious and utterly intolerable throughout our nation. Forty-seven years ago, local deputy sheriffs acted upon "some information that [Antonio Richard Rochin [9]] was selling narcotics" and forcibly opened the door to his bedroom, where he sat on his bed near a night stand that contained two capsules. *Rochin v. California,* 342 U.S. 165, 166, 72 S.Ct. 205, 96 L.Ed. 183 (1952). When asked by the deputies about the capsules, Rochin grabbed the pills and swallowed them. The deputies immediately jumped on Rochin and unsuccessfully attempted to extract the pills from his mouth. Rochin was handcuffed and taken to a nearby hospital where one of the officers instructed a doctor to pump his stomach. The doctor did so, and the capsules were recovered and found to contain morphine. *See id.* Rochin, who was subsequently convicted of possessing the morphine capsules, petitioned the Supreme Court for relief.

The Court, speaking through Justice Felix Frankfurter, concluded that the deputies' actions had violated the Due Process Clause of the Fourteenth Amendment. Although a different legal theory is presented here, the words of the Supreme Court are highly instructive on the issue of outrageousness. The *Rochin* Court opined that the deputies:

d[id] more than offend some fastidious squeamishness or private sentimental-

---

9. *See People v. Rochin,* 101 Cal.App.2d 140, 225 P.2d 1 (1950).

ism about combating crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of the government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and screw to permit constitutional differentiation.

342 U.S. at 172, 72 S.Ct. 205. None of the Defendants, in their motion, have advanced any reason why such conduct should be any less outrageous today than it was at the time of Rochin's arrest. Indeed, far less personally invasive conduct has been held to support an emotional distress claim in Michigan. *See, e.g., Smith*, 233 Mich.App. at 113, 592 N.W.2d at 721 (viable claim for intentional infliction of emotional distress against pastor, who exposed plaintiff's private confession of marital infidelity with prostitutes to entire congregation). Therefore, this Court, cannot find as a matter of law that the conduct of Payne and Lasseigne was not extreme or outrageous. Rather, there is a genuine issue of a material fact as to whether the conduct of these Defendants was extreme or outrageous. As a result, their motion for summary judgment on this claim must be denied.

### D. *Intentional Torts By Cosby*

Williams has also charged Cosby, who was the police sergeant with whom Payne and Lasseigne conferred immediately following the arrest, with wrongfully invading his rights. Although it is undisputed that Cosby never touched Williams or made any effort to do so, there is evidence, especially when viewing it in the light that is most favorable to the opponent of this

motion, that he ordered Payne and Lasseigne to undertake a course of conduct which could be construed as an act of assault and battery. This directive from Cosby also could be reasonably viewed by a jury as an order to commit an outrageous activity. Thus, the question presented here is whether these circumstances, as described by Williams, could constitute an intentional tort and, thereby, create liability against the superior officer for the alleged underlying misdeeds by his subordinates.[10]

Nearly thirty years ago, the Supreme Court of Michigan, in dicta, addressed this issue in *Stowers v. Wolodzko*, 386 Mich. 119, 191 N.W.2d 355 (1971). There, a doctor committed a patient to a private mental institution for psychiatric treatment on the basis of an involuntary commitment statute. *See id.* at 123–24, 191 N.W.2d 355. Later, when the patient refused to accept medication, several members of the hospital staff held her down and forcibly injected her with medication on the strength of the doctor's written orders and other instructions. *See id.* at 127, 191 N.W.2d 355. The doctor was not present at the time. The patient sued, and prevailed against, the doctor for assault, battery, and false imprisonment. *Id.*

On appeal, the doctor raised several issues, only one of which merits discussion here. The doctor argued that, since he was acting pursuant to a court commitment order, no liability for the claimed acts of assault and battery could be assigned to him. *See id.* at 138–39, 191 N.W.2d 355. The *Stowers* court rejected this argument, noting that the court order did not shield him from liability because it only authorized the patient to be committed but did not include nonconsensual

---

**10.** The issue before this Court is not whether the superior was negligent in supervising lower-level officers. Questions of foreseeability and special relationships are therefore irrelevant. The question is also not one of vicarious liability since the City—not Cosby—employs Payne and Lasseigne. Rather, the question is whether Cosby should be liable for assault and battery where he allegedly intended for an assaultive outcome to occur but ordered someone else to act on his own intent. For a discussion of "intent" as it pertains to assault and battery, see W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on the Law of Torts* 33–43 (Lawyer's ed.1984).

treatment. *Id.* at 139, 191 N.W.2d 355. Importantly, the court stated, "[g]iven the evidence of this case (and, indeed, defendant does not contend that he did not order certain medication and shots be given plaintiff), there was sufficient evidence that the jury could find that defendant committed assault and battery on the plaintiff." *Id.* Hence, under Michigan law, where a supervising employee orders to a lower-level employee to perform an arguably assaultive act, there is sufficient evidence to allow a jury to determine whether the supervisor committed assault and battery on the alleged victim. Thus, on the basis of Williams' claims, the entry of a summary judgment in favor of Cosby on the assault and battery issue would be inappropriate.

Moreover, there is no reason to apply a different standard of review as it pertains to Williams' claim against Cosby for an intentional infliction of emotional distress. Here, Williams contends that Cosby ordered the officers to initiate a stomach pumping procedure for the purpose of procuring evidence to support a conviction against him. When viewing this evidence in a light that is most favorable to Williams, it is clear that there is sufficient evidence upon which to allow a jury to evaluate his claim of intentional infliction of emotional distress against Cosby. Therefore, the Court denies Cosby's motion for summary judgment on the assault and battery and emotional distress claims.

E. *State Law Claims Against City of Pontiac*

■ Mich.Comp.Laws § 691.1407(1) establishes broad immunity from tort liability for government agencies. This statute provides that "[e]xcept as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function." Under Mich. Comp.Laws § 691.1401(a), (d), "governmental agency" means municipal corporations, including cities. It is well settled that one function of local municipal govern-

ment is to provide and control a police department. *See Smith v. City Comm'n of Flint,* 258 Mich. 698, 242 N.W. 814 (1932). No other apparent exception to state tort immunity is present here. Therefore, the Defendant, City of Pontiac, is entitled to a judgment on the present state law claims against it as a matter of law. This Court grants a summary judgment on those claims.

F. *42 U.S.C. § 1983*

1. *Individual Defendants*

In Count VIII of the Complaint, Williams alleges that Cosby, Payne and Lasseigne violated his rights under the Fourth and Eighth Amendments of the Constitution while acting under the color of state law. (Compl.¶¶ 51–56.) Specifically, he points to the claimed misconduct of Cosby, Payne and Lasseigne in connection with the involuntary medical procedure that was imposed upon him at the Pontiac Osteopathic Hospital during the early days of April 1998. (Compl. at ¶¶ 14–16, 18–20.) Clearly, each of the three Defendants were acting under the color of state law at all relevant times. Since the remaining allegations are significantly different, this Court will examine each claim separately for sufficiency.

(a) *Claims Against Payne and Lasseigne*

(1) *Qualified Immunity*

■ The qualified immunity doctrine "extends to government officials performing discretionary functions." *Blake v. Wright,* 179 F.3d 1003, 1007 (6th Cir.1999) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Under this doctrine, government officials who act in their official capacities are immune from personal civil liability if their actions do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396

(1982); see *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken"). Although the Defendants bear the burden of pleading the defense, Williams must demonstrate that they are not entitled to qualified immunity.[11] *Blake,* 179 F.3d at 1007 (citing Wegener v. Covington, 933 F.2d 390, 392 (6th Cir.1991)).

The first step in determining whether an official is entitled to qualified immunity is to determine whether the alleged acts violated clearly established law. *See id.* The purpose of this prong is to "ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability'...." *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)) (discussing effective equivalence of civil "clearly established law" and criminal "fair warning" standards).

■ In order to uphold this purpose, it is not necessary for the alleged conduct to have violated the law under the particular theories that have been advanced by Williams. *See generally Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 ("[It] is not [correct] to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.") (citations omitted). The fundamental question is whether the unlawfulness of the action is apparent. *See id.*

■ At the time of the incident here, the law was well settled that the use of stomach pumping as a means to procure evidence violates an arrestee's rights to due process. *Rochin,* 342 U.S. at 172, 72 S.Ct. 205, *cited in Mansfield Apartment Owners Ass'n v. City of Mansfield,* 988 F.2d 1469, 1478 n. 8 (6th Cir.1993). Such measures "shock the conscience." *Rochin,* 342 U.S. at 172, 72 S.Ct. 205. If the allegations which have been advanced in this cause by Williams are correct, the officers' conduct would appear to be in violation of clearly established law.

■ As a second step, this Court must seek to determine "whether a reasonable person in the defendant's position would have known that his or her actions violated clearly established rights." *Blake,* 179 F.3d at 1008. This determination only invokes an objective standard. The official's subjective intent is irrelevant. *See id.* (citing Crawford–El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)). Forcible stomach pumping is the kind of activity that "is bound to offend even hardened sensibilities." *Rochin,* 342 U.S. at 172, 72 S.Ct. 205. *Rochin* is not an obscure case, but rather it is a textbook case that is widely cited by judges and academics. *See, e.g.,* Yale Kamisar, Wayne R. LaFave & Jerold H. Israel, *Modern Criminal Procedure, Cases, Comments, and Questions* 43 (8th ed.1994). When superimposing Williams' allegations against the applicable law that existed during the early months of 1998, it would appear that a reasonable police officer should have known that the utilization of a forcible stomach pumping procedure in order to acquire evidence would violate a citizen's clearly established rights. This facially apparent violation of the law defeats Payne's and Lasseigne's defense of qualified immunity. As a consequence, this Court need not, and will not, address these officers' roles, if any, in Williams' forcible catheterization or his allegedly unlawful arrest.

---

**11.** Since qualified immunity provides immunity from suit in federal court, "a party may immediately appeal a district court's denial of qualified immunity." *Blake,* 179 F.3d at 1007 (citing Behrens v. Pelletier, 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)).

### (2) Constitutional Claims

■ The question presented here is whether the entry of a summary judgment is an appropriate remedy on all of Williams' claims that are based on the Eighth Amendment. The federal courts analyze claims that police officers have used excessive force in the course of an arrest under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Once firmly in police custody, an arrestee becomes a pretrial detainee. "It is clear ... that the Due Process clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* at 395 n. 10, 109 S.Ct. 1865. The Eighth Amendment analysis does not become primary until one is convicted of a crime. *See id.; Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir.1992) (post-conviction excessive force claims are to be raised "exclusively under the Eighth Amendment's cruel and unusual punishment clause"). Nonetheless, the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) continues to hold that pretrial detainees, in addition to due process, are "entitled to the same Eighth Amendment rights as other inmates." *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242 (1994).[12]

Here, no party has maintained that the officers were attempting to punish Williams by subjecting him to involuntary medical procedures. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with ... supplying medical needs...." *Id.* The infliction of pain is not cruel and unusual merely because, in retrospect, the use of force appears unreasonable. *See id.*

■ In the case at bar, Williams has presented evidence that Payne and Lasseigne disregarded his pleas to refrain from pumping his stomach.[13] No party maintains that the procedure, which has been previously described in this Order, does not involve pain or that some injury may result from its involuntary application. This evidence creates a genuine issue of a material fact as to whether these officers' actions were objectively and subjectively wanton. Thus, this Court concludes that (1) there is sufficient evidence upon which to require the submission of the issue of wantonness to the trier of fact, and (2) a summary judgment is denied to these Defendants as to Williams' Eighth Amendment claims. The other constitutional claims, moreover, remain.[14]

---

12. In any event, "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), *quoted in* County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998); *see Davis v. Brady*, 143 F.3d 1021, 1026 (6th Cir.1998) (same).

13. Although the purported exchange between Cosby, Payne and Lasseigne at the Pontiac Police Station with regard to the pumping of Williams' stomach is not conclusive, the obscene terminology that has been attributed to these officers suggests a measure of contempt that, when assessed along with the other evidence, could lead reasonable jurors to conclude that they exhibited wantonness in their treatment of this prisoner.

14. In their motion, the Defendants did not discuss Williams' § 1983 claims for violations of the Fourth Amendment. In their reply brief, they declined to respond to those claims for reasons of mootness inasmuch as Williams had declined to pursue his state law claims for unreasonable search and seizure and false arrest and imprisonment. (Def.'s Reply Br. at 6.) However, since (1) Williams did not agree to drop the federal claims, and (2) this Court has not endorsed the reasons which underlie his concessions, the Defendants' motion for a summary judgment will not be granted on the pending Fourth Amendment claims.

(b) *Claims Against Cosby*

██ The Sixth Circuit established the "supervisory liability" test in *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir.1984), *cited in Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 511 (6th Cir.1996). The *Bellamy* court held that "[section] 1983 liability of supervisory personnel must be based on more than the right to control employees. . . . There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* at 421, *quoted in Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76, 81 (6th Cir.1995). This requires Williams to "show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.*

██ Here, Cosby was the sergeant who purportedly instructed the arresting officers to take Williams to the Pontiac Osteopathic Hospital to extract evidence from his stomach. This is sufficient to create a genuine issue of a material fact as to whether Cosby authorized or instructed his subordinate officers to undertake an unconstitutional stomach pumping of a detainee. This Court, therefore, denies Cosby's motion for summary judgment on these claims.[15]

2. *Claims Against City of Pontiac*

██ The City of Pontiac argues that Williams has not proffered any evidence that would allow a rational trier of fact to find it liable under § 1983. Municipalities are subject to liability under § 1983 only for those injuries that were inflicted pursuant to a custom or policy of the municipality. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although a single act by a policy-making official may create a policy, *see Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion), it is well settled that low-level police

officers are not policy-making officials, *see id.* at 821, 105 S.Ct. 2427. The issue here is whether the City of Pontiac failed to train or discipline its employees so that its policy is properly inferred from a totality of the circumstances.

██ To support a claim that a municipality failed either to train or to discipline its agents, a plaintiff must show that the failure amounted to a deliberate indifference to the rights of the relevant public. *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (failure to train); *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir.1994) (failure to discipline). In considering the issue, courts focus their attention on the adequacy of the training to the tasks that the officers must perform. *Canton*, 489 U.S. at 390, 109 S.Ct. 1197.

██ Cosby said that it was the policy of the City of Pontiac and its police department at the time of Williams' arrest to send any person, whom the arresting officers believed had swallowed drugs, to a hospital for stomach pumping. (Cosby Dep. at 19:9–17.) According to him, there are two purposes for requesting this medical procedure; to wit, (1) to ensure the safety of the detainee, and (2) to gather evidence for a successful prosecution. (Cosby Dep. at 7:19–8:1.) He said that suspects commonly "throw [drugs] in their mouth and swallow it" prior to their arrest. (Cosby Dep. at 7.) Cosby and Payne also acknowledged that they, as police officers, had been involved with the pumping of a detainee's stomach on several occasions prior to Williams' arrest. (Cosby Dep. at 6:23–24, 7:10–11; Payne Dep. at 36:24–37:2.) The City and the three law enforcement Defendants also admit that "the officers were familiar enough with situations wherein suspects swallow suspected narcotics that they assumed that the hospital would in all likelihood pump [ ] Williams'

15. Sergeant Cosby's motion for summary judgment on the remaining claims will be

denied for the same reasons that have been set forth in note 14, *supra*.

stomach." (Def.'s Br.Supp.Mot.Summ.J. at 3 n. 3 (citing Ex. B at 37, Ex. F at 19)).)

One clear and reasonable conclusion that can be drawn from these admissions is that the City of Pontiac, through its police department, maintained a widespread practice to take suspects whom they believed to have ingested narcotic evidence to a hospital for a stomach pumping procedure. These admissions also suggest that one of the ordinary, foreseeable tasks of a police officer is to confront people who are suspected of engaging in the illicit drug market, and that such people commonly ingest drug-related evidence. The facts, when taken in the light most favorable to the opponent of the motion, are sufficient to create a genuine issue of a material fact as to whether a claimed unconstitutional police practice was so widespread as to evince deliberate indifference on the part of the City which resulted in a violation of Williams' constitutional rights. Therefore, the City's motion for summary judgment on Williams' federal claims is denied.

## G. *Summary*

In summary, this Court grants the motion to dismiss Counts II and III as to all moving parties inasmuch as they pertain to Michigan's Constitution (to wit, the state law claims for Unreasonable Search and Seizure and Cruel or Unusual Punishment) and Count IV (to wit, False Arrest and Imprisonment) because Williams has conceded that he cannot maintain those claims.

The Court also grants a summary judgment in favor of all of the movants on Count VI (to wit, Violation of Ministerial Duties) because Williams has failed to identify any ministerial duty that the Defendants did not perform under the law. The Court further grants a summary judgment in favor of the City of Pontiac on all of the state law claims on the basis of immunity.

However, the Court denies the Defendants' motion as it relates to all of the remaining claims for the reasons that have been set forth above.

## IV. *CLAIMS BY WILLIAMS AGAINST BROCK AND THE PONTIAC OS- TEOPATHIC HOSPITAL*

The Defendants, Brock and the Pontiac Osteopathic Hospital, filed a separate motion for summary judgment. Therein, Brock contends, in essence, that (1) he exercised his independent medical judgment in deciding whether to order the challenged medical procedures, and (2) the state did not obligate him to perform any of the medical procedures, about which Williams has complained. Thus, Brock maintains that he is not a state actor, and Williams cannot support his claims under § 1983.

Williams responds by asserting that there is sufficient evidence in the record to create a genuine issue of a material fact as to whether Brock was acting under color of state law during all times that are relevant to this proceeding. He says that the conduct of the doctor, who acted in cooperation with the law enforcement officers, should be attributed to the state. Likewise, he maintains that a genuine issue of a material fact remains as to whether his rights under the Fourth and Eighth Amendments of the United States Constitution were violated by Brock.

Both parties present additional arguments on various state law claims. The Court will address these arguments in turn.

## A. *42 U.S.C. § 1983: "Under the Color of State Law"*

The most important issue of law in this motion is whether state compulsion caused Brock, a private physician, to perform certain invasive medical procedures and thus made him a state actor, thereby providing Williams with a basis upon which to claim liability under 42 U.S.C. § 1983.

In order to sustain a claim under this statute, a plaintiff must show that a defendant acted "under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The color of

law requirement is similar to and intertwined with the state action requirement of the Fourteenth Amendment. The state action requirement "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power.... A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–37, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Similarly, the "color of law" requirement limits the scope of injurious conduct for which a plaintiff may have a federal remedy under § 1983. Ordinarily the conduct of private persons is not reachable under § 1983.

The Sixth Circuit has recognized "three tests employed by the courts to determine whether the challenged conduct [of private persons] is fairly attributable to the state [under § 1983]:(1) the public function test, (2) the state compulsion test and (3) the symbiotic relationship or nexus test." *Collyer v. Darling*, 98 F.3d 211, 232 (6th Cir.1996) (citing Wolotsky v. Huhn, 960 F.2d 1331 (6th Cir.1992)). In his opposition papers, Williams submits that the "state compulsion" test is applicable to this case and "requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.2d at 1335, *quoted in Collyer*, 98 F.3d at 232. He maintains that Payne and Lasseigne overtly encouraged Brock to initiate the procedures which violated his constitutional rights.

■■ It is uncontroverted that (1) Lasseigne expressly requested Brock to pump Williams' stomach for evidence, (2) Brock relied heavily on Payne's account of Williams' pretreatment conduct, and (3) with the exception of being agitated,[16] Williams did not exhibit any medical signs

of drug ingestion, let alone overdose, during his tenure at the Pontiac Osteopathic Hospital. The medical evaluation form contained the words, "for evidence," as the first reason for the procedure.

Brock and the Hospital cite *Rudy v. Village of Sparta*, 990 F.Supp. 924 (W.D.Mich.1996), for the proposition that private doctors (and their employers) are not—as a matter of law—subject to state compulsion if they order procedures for medical reasons on the basis of their own professional judgment. This interpretation, however, begs the question that has been presented here. The precise question is whether Brock effectively and sufficiently exercised his own judgment. Moreover, the facts of this case are distinguishable from those that were before the *Rudy* court on the issue of the judgment of the alleged tortfeasor.

In *Rudy*, the plaintiff, who had been arrested for driving while intoxicated, underwent a non-consensual catheterization when he was unable to produce a urine sample by other means. *See id.* at 927. The arresting officer, after obtaining a warrant to withdraw Rudy's blood, took him to a hospital. The warrant did not authorize the catheterization. *See id.* at 926, 927. When he became combative at the hospital, a doctor authorized the hospital staff to submit the plaintiff to a urine test to screen for possible drug influence. *See id.* at 927. According to the doctor, (1) this was the standard procedure for combative patients, and (2) he ordered the test "for medical reasons solely as the result of his considered medical opinion." *Id.* When Rudy could not voluntarily produce the urine sample, the doctor ordered the catheterization, and the police officer commanded the attending technician to "just do it" (to wit, forcibly catheterize the plaintiff). *Id.* The plaintiff brought various

---

**16.** Brock acknowledged that Williams' state of agitation could have been attributable to his (1) detention by the police, (2) presence in

a hospital, or (3) knowledge that he was about to undergo a stomach pumping procedure.

claims including ones under § 1983 against the doctor and hospital.

The *Rudy* court held that the doctor and hospital did not act under color of state law when the plaintiff was catheterized. *Id.* The court reasoned that the doctor had based his decision on his own professional judgment and for medical reasons.[17] *Id.* Hence, the court concluded that the plaintiff had failed to satisfy his "under color of law" requirement because he was unable to establish any nexus between the conduct of the doctor and the action by the state. *Id.*

Here, Brock has asserted in a conclusory manner that he decided to lavage Williams's stomach on the basis of his discretionary medical judgment. Nonetheless, he maintains that the police officers initiated the discussion about the lavage and made their desire for the evidence known from the beginning of their conversation. (Brock Dep. at 25, 48.) Additionally, the evidence is uncontroverted that Williams did not present any identifiable symptoms of toxicity and on the whole appeared in normal condition. By contrast, the plaintiff in *Rudy* had consumed at least 12 beers, smoked at least two marijuana cigarettes, fallen asleep, and urinated in his pants. 990 F.Supp. at 926–27. Thus, *Rudy* is significantly distinguishable on the issue of whether Brock effectively rendered any independent judgment prior to embarking upon this controversial procedure.

Although the issue of what constitutes state compulsion for physicians performing medical procedures on pretrial detainees appears to be one of first impression in this Circuit, the Sixth Circuit has considered physician liability under the related "public function" test.[18] In *Collyer*, 98 F.3d 211, the plaintiff alleged that the actions which surrounded his termination from civil service employment improperly impinged his rights under the First Amendment and Due Process Clause. *See id.* at 216–17. He asserted two due process claims against the doctors who performed psychiatric evaluations on him pursuant to their contract with the state. *See id.* at 217, 231–32. The court held the defendants were not state actors largely because they were private doctors who had retained their ability to reach an independent medical decision. *Id.* at 231, 232. Unlike the circumstances in the instant case, the *Collyer* physicians interviewed the plaintiff alone, and, hence, they were not subject to the kind of state influence that occurred here. In *Collyer*, moreover, there was no medical record that evinced an invasive act that was similar to Williams' experience.

To find guidance relating to the issue before this Court, it is necessary to return to the source of the "state compulsion test" (to wit, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). *See Wolotsky*, 960 F.2d at 1335. In *Adickes* a white woman sought to eat at a restaurant with her students, all of whom were African Americans. Adickes was refused service "because she was

17. During the trial, the doctor maintained that the treating nurse, rather than the police officer, had initially presented the idea of catheterizing the plaintiff. *See id.* at 930.

18. For example, in *Ellison v. Garbarino*, 48 F.3d 192 (1995), the plaintiff sued the doctors who ordered his involuntary commitment for psychiatric evaluation pursuant to the state law of Tennessee. The court held that the doctors and their employer were not state actors because they retained discretion, and state involvement and legislation was not so encouraging or coercive as to require attribu-

tion of the action to the state. *See* 48 F.3d at 196. *Ellison* is distinguishable because the laws at issue allowed doctors to commit certain persons but did not suggest or encourage them to do so. *See id.* The law, moreover, gave physicians the sole discretion as to whether to commit someone. *See id.* By contrast here, the evidence creates a genuine issue of a material fact about whether (1) police officers expressly encouraged a doctor to perform a medical procedure for an illegal reason, and (2) Brock exercised his independent judgment or discretion as a physician.

a white person 'in the company of Negroes.'" 398 U.S. at 149, 90 S.Ct. 1598. A police officer entered the restaurant while Adickes and her students were present and exited before them. *Id.* There was no evidence of any direct communication at that time between the officer and the restauranteur. *See id.* at 153–56, 90 S.Ct. 1598. The restauranteur refused to serve Adickes, and, upon her departure from the restaurant, she was arrested for vagrancy. *See id.* at 149, 90 S.Ct. 1598. Ms. Adickes sued the restauranteur under 42 U.S.C. § 1983 for (1) refusing to serve her pursuant to a constitutionally defective state custom, 398 U.S. at 147, 90 S.Ct. 1598, and (2) conspiring with the police officer to deprive her of constitutional rights, *id.* at 148, 90 S.Ct. 1598.

The *Adickes* Court made two principles clear. First, a plaintiff will be able to establish a prima facie case pursuant to § 1983 against a private party under a theory of conspiracy if she is able to establish that the defendant and a "policeman somehow reached an understanding" to cause a violation of her constitutional rights. *Id.* at 152, 90 S.Ct. 1598. A tenable case similarly is presented against a private employer if the plaintiff can prove that the employer's agent reached the same understanding.[19] *See id.* Following a review of the record, especially as to those matters which pertain to Brock, the two police officers, and Williams, the facts in this case support the conclusion that a genuine issue of a material facts exists as to whether the police and Brock reached

an understanding to pump Williams' stomach for evidence. Moreover, it is well settled that a person presumptively violates the constitutional right to due process of a pretrial detainee whose stomach has been pumped for evidence. *See Rochin,* 342 U.S. 165, 72 S.Ct. 205. Hence, summary judgment is not warranted on Williams' allegations of conspiracy.

Second, the *Adickes* Court sought to determine at what point state involvement in a private action rises to the level of state compulsion, so that private parties are deemed to be engaging in state action.[20] 398 U.S. at 170, 90 S.Ct. 1598 (analyzing related state action requirement under Fourteenth Amendment). The Court concluded that "if petitioner can show (1) the existence of a state-enforced custom [that violates the Constitution]; and (2) that [the private action] was motivated by that state-enforced custom, she will have made out a claim under § 1983." *Id.* at 173–74, 90 S.Ct. 1598. A plaintiff can prove a constitutionally defective state-enforced custom by showing that the local police retained an unconstitutional policy. *See id.* at 172, 90 S.Ct. 1598 ("[P]etitioner may be able to show ... that [local] police would intentionally tolerate violence or threats of violence directed toward those who violated the practice of segregating the races at restaurants."). The import of the decision in *Adickes* is that where a plaintiff offers evidence which creates a genuine issue of whether (1) state officials maintained an unconstitutional policy, and (2) a private party acted

**19.** Although the parties' briefs specifically address whether Brock was a state actor under the "state compulsion" test, this Court may examine all of the pleadings and evidence in the light that is most favorable to Williams in an effort to determine whether there is a genuine factual issue for trial. In Count X, Williams alleges Brock engaged in "joint action in concert" with the police, in violation of § 1983. (Compl.¶ 61–65.) These allegations and the evidence create a genuine issue of a material facts as to whether Brock and the Pontiac Osteopathic Hospital participated

in a conspiracy with the police to deprive him of his constitutional rights.

**20.** The Court opined that if a state requires private citizens to engage in an action that would violate the Constitution if it were committed by a state official, private compliance will be deemed to be state action. 398 U.S. at 170, 90 S.Ct. 1598. Likewise, if the state prosecutes or punishes people for failing to engage in such action, private compliance will be state action. *Id.*

in accordance with or to facilitate that policy, this Court will not grant a summary judgment because a genuine issue remains for trial whether private action was, in fact, state action under the "state compulsion" test.

Here, as to the first prong, the facts which encompass the practice and policies of the City of Pontiac and the Pontiac Osteopathic Hospital are sufficient to create a genuine issue whether the police department maintained a policy of seeking to obtain evidence from an individual in violation of the Constitution as interpreted in *Rochin*, 342 U.S. 165, 72 S.Ct. 205. As to the second prong, the interactions between Brock, Williams, Payne and Lasseigne at the Pontiac Osteopathic Hospital on April 5, 1998, when viewed in a light that is most favorable to the opponent of this dispositive motion, clearly suggest that a genuine factual issue remains for trial as to whether Brock was a state actor under the "state compulsion" test.

In summary, this record contains a sufficient quantum of evidence upon which this Court has concluded that genuine issues of a material fact exist for resolution by the jury, which may address whether Brock (1) conspired with Payne and Lasseigne and/or (2) acted under state compulsion and thus deprived Williams of his constitutional rights under the "color of state law." Finally, if it is determined that Brock or some other medical staff violated Williams' constitutional rights, the Pontiac Osteopathic Hospital, as their employer could also be held liable according to the *Adickes* rationale. Hence, the Defendants' motion for summary judgment on the § 1983 claims is denied.

### B. *Remaining Claims by Williams*

Williams has conceded that he will (1) renounce all of his claims against the Defendants arising out of the Michigan Constitution and (2) rescind his claim against Brock and the Pontiac Osteopathic Hospital for their alleged violation of ministerial duties. On the basis of these concessions, the Court grants a summary judgment on those claims.

The remainder of the Defendants' arguments do not merit summary judgment. Brock and the Pontiac Osteopathic Hospital argue that this Court must dismiss Williams' federal claim for search and seizure because, in their opinion, (1) there was no evidence of any state action here, and (2) all acts were reasonable since they were based only on Brock's medical judgment. Based on the facts and for the reasons that have been stated earlier, this Court disagrees and finds that these represent genuine issues for resolution at trial. These Defendants also contend Williams' federal claim for cruel and unusual punishment must fail since he was not a prisoner. However, the Sixth Circuit has held that, in addition to due process, pretrial detainees are "entitled to the same Eighth Amendment rights as other inmates." *Thompson*, 29 F.3d at 242.[21] Their argument is without merit.[22]

■ In their pleadings, Brock and the Pontiac Osteopathic Hospital contend that Williams' claim for assault and battery is

---

**21.** *See also* note 12, *supra.*

**22.** The Defendants move for a summary judgment on any claim arising out of Mich.Comp. Laws § 764.25b, which makes it a misdemeanor for any law enforcement officer or employee of a law enforcement agency to execute a body cavity search, including a search of the stomach, without a warrant. They argue that Brock exercised his own judgment and was not a law enforcement officer or employee. This Court finds that the entry of a summary judgment on this provision would be inappropriate since there is a genuine issue as to whether the doctor engaged in a state action. The parties did not brief, plead, or present evidence on whether any civil action may arise out of § 764.25b if the doctor was a state actor under federal law.

legally impaired for two reasons; namely, Brock (1) rendered treatment solely according to his medical judgment, and (2) determined that Williams was not competent to give or withhold consent to treatment. A physician commits assault and battery when the physician treats or operates on a patient without consent. *See Werth v. Taylor,* 190 Mich.App. 141, 146, 475 N.W.2d 426 (1991). On the other hand, consent may be implied, as in cases of emergency where there is no opportunity to obtain actual consent or where the patient seeks treatment or otherwise manifests consent. *Id.*

Here, it is uncontroverted that Williams expressly, repeatedly requested that the medical staff refrain from performing any procedures. In his reply, Brock says that was his determination that Williams was not competent to consent because he was under the influence of mind-altering drugs. Inasmuch as the record indicates that immediately prior to the challenged medical procedure, Williams (1) spoke in full sentences and appeared "non-toxic," and (2) did not exhibit any indicia of drug ingestion or overdose, aside from being belligerent, it is clear that a genuine issue of a material fact exists as to whether Brock has an adequate consent defense to the claims of assault and battery. Hence, the Defendants' summary judgment request must be denied.

Finally, the Defendants maintain that Williams' claim for an intentional infliction of emotional distress is without merit, contending that there is no evidence of extreme or outrageous conduct in the case. This Court disagrees. In *Rochin,* the Supreme Court characterized pumping a detainee's stomach for evidence as an act that "shocks the conscience," "do[es] more than offend some fastidious squeamishness or private sentimentalism about combatting [sic] crime too energetically," "of-

fend[s] even hardened sensibilities," and resembles too much "the rack and screw to permit constitutional differentiation." 342 U.S. at 172, 72 S.Ct. 205. The evidence here, therefore, creates a genuine issue relating to the question of whether Brock committed an extreme or outrageous act, as claimed by Williams. Hence, the Defendants' request for a summary judgment on this issue must be denied.

### C. *Summary*

This Court denies the Defendants' motion for summary judgment on the § 1983 claims since a genuine issue for trial remains as to whether Brock was a state actor pursuant to the "state compulsion" test or conspired with state officials to deprive Williams of certain fundamental constitutional rights. This Court also denies their motion for summary judgment on the federal claims under the Fourth and Eighth Amendments and the state law claims of assault, battery, and intentional infliction of emotional distress because they have failed to demonstrate the absence of genuine issues of material fact. However, the Court acting upon Williams' concessions, grants a summary judgment in favor of the Defendants on those claims that are based on (1) the Michigan Constitution and (2) the state law relating to their alleged violation of certain ministerial duties.

IT IS SO ORDERED.